GREEN ET AL. *v.* UNITED STATES.

No. 100.   Argued October 21, 1957.—Decided March 31, 1958.

166

*John J. Abt* argued the cause and filed a brief for petitioners.

*Ralph S. Spritzer* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Tompkins, Philip R. Monahan* and *Jerome L. Avedon.*

Mr. Justice Harlan delivered the opinion of the Court.

Petitioners are two of eleven defendants who were convicted in the Southern District of New York in 1949 of conspiring to teach and advocate the violent overthrow of the Government in violation of the Smith Act, 54 Stat. 670, 671, 18 U. S. C. §§ 371, 2385. Their convictions, each carrying a $10,000 fine and five years' imprisonment, were affirmed by this Court on June 4, 1951, in *Dennis* v. *United States*, 341 U. S. 494. After their convictions, petitioners had been enlarged on bail, and following the affirmance, the United States Attorney served counsel for the petitioners on June 28, 1951, with copies of a proposed order on mandate requiring petitioners to surrender to the United States Marshal on July 2 for the execution of their sentences, and with a notice that such order would be presented to the District Court for signature on the indicated day of surrender. Petitioners were thereupon informed by their counsel that their presence in court would be required on July 2. Both, however, disappeared from their homes, failed to appear in court when the surrender order was signed on July 2, and remained fugitives for more than four and a half years. Ultimately both voluntarily surrendered to the United States Marshal in New York, Green on February 27, 1956, and Winston on March 5, 1956.

Shortly thereafter, the United States instituted criminal contempt proceedings against the petitioners in the District Court for willful disobedience of the surrender order in violation of 18 U. S. C. § 401 (see p. 168, *infra*). Pursuant to Rule 42 (b) of the Federal Rules of Criminal Procedure, these proceedings were tried to the court without a jury.[1] Following a hearing, the court found

---

[1] This Rule provides that criminal contempts other than those committed in the actual presence of the court and seen or heard by

petitioners guilty of the contempts charged and sentenced each to three years' imprisonment to commence after service of the five-year sentences imposed in the conspiracy case. See 140 F. Supp. 117 (opinion as to Green). The Court of Appeals affirmed, 241 F. 2d 631, and we granted certiorari because the case presented important issues relating to the scope of the power of federal district courts to convict and sentence for criminal contempts. 353 U. S. 972.

The petitioners urge four grounds for reversal, namely: (1) the criminal contempt power of federal courts does not extend to surrender orders; (2) even if such power exists, the evidence was insufficient to support the judgments of contempt; (3) a prison sentence for criminal contempt cannot, as a matter of law, exceed one year; and (4) in any event the three-year sentences imposed were so excessive as to constitute an abuse of discretion on the part of the District Court. For the reasons given hereafter we think that none of these contentions can be sustained, and that the judgment of the Court of Appeals must be upheld.

## I.

The contempt judgments rest on 18 U. S. C. § 401, which in pertinent part provides that a federal court:

> ". . . shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
>
> .        .        .        .        .
>
> "(3) Disobedience or resistance to its lawful . . . order . . . ."

the court shall be prosecuted on notice. Notice may be given, as in the present case, by an order to show cause. The Rule states that a defendant is entitled to trial by jury if an Act of Congress so provides. See note 19, *infra.*

Since the order here issued was beyond dispute "lawful," § 401 plainly empowered the District Court to punish petitioners for disobeying it unless, as petitioners claim, this order is outside the scope of subdivision (3). This claim rests on the argument that the statute, viewed in its historical context, does not embrace an order requiring the surrender of a bailed defendant.

An evaluation of this argument requires an analysis of the course of development of federal statutes relating to criminal contempts. The first statute bearing on the contempt powers of federal courts was enacted as § 17 of the Judiciary Act of 1789, 1 Stat. 73, 83. It stated that federal courts "shall have power to . . . punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same . . . ." The generality of this language suggests that § 17 was intended to do no more than expressly attribute to the federal judiciary those powers to punish for contempt possessed by English courts at common law. Indeed, this Court has itself stated that under § 17 the definition of contempts and the procedure for their trial were "left to be determined according to such established rules and principles of the common law as were applicable to our situation." *Savin, Petitioner*, 131 U. S. 267, 275–276.[2] At English common law disobedience of a writ under the King's seal was early treated as a contempt, 4 Blackstone Commentaries 284, 285; Beale, Contempt of Court, 21 Harv. L. Rev. 161, 164–167; Fox, The Summary Process to Punish Contempt, 25 L. Q. Rev. 238, 249, and over the centuries English courts came to use the

---

[2] The debates conducted in 1830–1831 by leading counsel of that period during the impeachment proceedings against Judge James H. Peck, see p. 171, *infra*, contained discussions of the Act of 1789, and the limitations to be imposed upon it, which were cast largely in terms of the English common law preceding its enactment. See Stansbury, Report of the Trial of James H. Peck (1833).

King's seal as a matter of course as a means of making effective their own process. Beale, at 167. It follows that under the Judiciary Act of 1789 the contempt powers of the federal courts comprehended the power to punish violations of their own orders.[3]

So much the petitioners recognize. They point out, however, that, at early English law, courts dealt with absconding defendants not by way of contempt, but under the ancient doctrine of outlawry, a practice whereby the defendant was summoned by proclamation to five successive county courts and, for failure to appear, was declared forfeited of all his goods and chattels. 4 Blackstone Commentaries 283, 319. In view of this distinct method at English common law of punishing refusal to respond to this summons, which was the equivalent of the present surrender order, petitioners argue that § 17 of the Judiciary Act of 1789, incorporating English practice, did not reach to a surrender order, and that the unique status of such an order subsisted under all statutory successors to § 17, including § 401 (3) of the existing contempt statute.

We find these arguments unconvincing. The reasons for the early English practice of proceeding against absconding defendants by way of outlawry rather than by contempt are obscure. It may have been that outlawry was resorted to because absconding was regarded so seriously as to require the drastic penalties of outlawry rather than fine or imprisonment. But whatever the reasons may have been, the fact that English courts adhered

---

[3] During the debates in 1830–1831 referred to in note 2, *supra,* several of the managers who argued that Judge Peck had exceeded the historical boundaries of the contempt power by the conduct which had provoked the impeachment proceedings (see p. 171, *infra*) appear to have assumed that courts were historically justified in employing the contempt power to deal with disobedience to court process. See Stansbury, *supra,* note 2, at 313, 395–396, 436, 444.

to the *practice* of dealing with such cases by outlawry should not obscure the general principle that they had *power* to treat willful disobedience of their orders as contempts of court. It is significant that, so far as we know, the severe remedy of outlawry, which fell into early disuse in the state courts, was never known to the federal law. See *United States* v. *Hall,* 198 F. 2d 726, 727–728. Its unavailability to federal courts, and the absence of any other sanctions for the disobedience of surrender orders, are in themselves factors which point away from the conclusion that the kind of power traditionally used to assure respect for a court's process should be found wanting in this one instance.

The subsequent development of the federal contempt power lends no support to the petitioners' position, for the significance of the Act of 1831, 4 Stat. 487, 488, lies quite in the opposite direction. Sentiment for passage of that Act arose out of the impeachment proceedings instituted against Judge James H. Peck because of his conviction and punishment for criminal contempt of a lawyer who had published an article critical of a decision of the judge then on appeal. Although it is true that the Act marks the first congressional step to curtail the contempt powers of the federal courts, the important thing to note is that the area of curtailment related not to punishment for disobedience of court orders but to punishment for conduct of the kind that had provoked Judge Peck's controversial action. As to such conduct, the 1831 Act confined the summary power of punishment to ". . . misbehaviour of any person . . . in the presence of the . . . courts, or so near thereto as to obstruct the administration of justice . . . ." The cases in this Court which have curbed the exercise of the contempt power by federal courts have concerned this clause, as found in statutory successors to the Act of 1831 including subdivision (1) of present 18 U. S. C. § 401, or a further clause in the Act

and its successors dealing with misbehavior of court "officers," now found in subdivision (2) of § 401.[4]

In contrast to the judicial restrictions imposed on the contempt power exercisable under the clauses now found in subdivisions (1) and (2) of § 401, we find no case suggesting that subdivision (3) of § 401, before us here, is open to any but its obvious meaning. This clause also finds its statutory source in the Act of 1831, which first made explicit the authority of federal courts to punish for conduct of the kind involved in this case by providing that the contempt power should extend to ". . . disobedience or resistance . . . to any lawful writ, process, order, rule, decree, or command . . ." of a federal court. Particularly in the absence of any showing that the old practice of outlawry was ever brought to the attention of Congress, there is no warrant for engrafting upon this unambiguous clause a dubious exception to the English contempt power stemming from this practice. Although the 1831 Act no doubt incorporated many of the concepts of the English common law, its legislative history indicates that Congress sought to define independently the contempt powers of federal courts rather than to have the Act simply reflect all the oddities of early English practice. The House Committee which reported the bill had been directed "to inquire into the expediency of *defining* by statute all offences which may be punished as contempts of . . ." federal courts. 7 Cong. Deb., 21st Cong., 2d Sess. (Gale's & Seaton's Reg.), pp. 560–561. (Italics added.) See Frankfurter and Landis, Power to Regulate Contempts, 37 Harv. L. Rev. 1010, 1024–1028.

---

[4] See, *e. g.*, *In re Michael*, 326 U. S. 224, *Nye* v. *United States*, 313 U. S. 33, and *Ex parte Hudgings*, 249 U. S. 378, all concerning the predecessor statutes to present § 401 (1), which relates to misbehavior in court or so near thereto as to obstruct the administration of justice, and *Cammer* v. *United States*, 350 U. S. 399, arising under § 401 (2), which deals with misbehavior of court officers in their official transactions.

Entirely apart from the historical argument, there are no reasons of policy suggesting a need for limitation of the contempt power in this situation.  As the present cases evidence, the issuance of a bench warrant and the forfeiture of bail following flight have generally proved inadequate to dissuade defendants from defying court orders.  See Willoughby, Principles of Judicial Administration (1929), 561–566.  At the time these contempts were committed bail-jumping itself was not a criminal offense, and considerations in past decisions limiting the scope of the contempt power where the conduct deemed to constitute a contempt was also punishable as a substantive crime are not here relevant.  Cf. *Ex parte Hudgings,* 249 U. S. 378, 382.  There is small justification for permitting a defendant the assurance that his only risk in disobeying a surrender order is the forfeiture of a known sum of money, particularly when such forfeiture may result in injury only to a bail surety.

It may be true, as petitioners state, that this case and those of the other absconding *Dennis* defendants, *United States* v. *Thompson,* 214 F. 2d 545; *United States* v. *Hall,* 198 F. 2d 726, provide the first instances where a federal court has exercised the contempt power for disobedience of a surrender order.  But the power to punish for willful disobedience of a court order, once found to exist, cannot be said to have atrophied by disuse in this particular instance.  Indeed, when Congress in 1954 made bail-jumping a crime in 18 U. S. C. § 3146, it expressly preserved the contempt power in this very situation.  We find support in neither history nor policy to carve out so singular an exception from the clear meaning of § 401 (3).

## II.

Petitioners contend that the evidence was insufficient to support their contempt convictions, in that it failed to establish beyond a reasonable doubt their knowledge

of the existence of the surrender order. The Court of Appeals did not address itself to this contention, considering the issue foreclosed by its prior decisions in the *Thompson* and *Hall* cases, *supra,* where the evidence as to those other two *Dennis* defendants who were convicted of similar criminal contempts was identical with that involved here, except as to the circumstances of their ultimate apprehension.

In this Court, petitioners interpret the District Court's opinion to rest the contempt convictions on alternative theories: (a) that the petitioners had actual knowledge of the issuance of the July 2 surrender order, or (b) that they at least had notice of its prospective issuance and hence were chargeable with knowledge that it was in fact issued. But we find no such dual aspect to the District Court's decision, which rested solely on findings that, beyond a reasonable doubt, Green "knowingly disobeyed" the surrender order and Winston absented himself "with knowledge" of the order. Since we are satisfied that the record supports these findings, we need not consider whether mere notice of the prospective issuance of the order, cf. *Pettibone* v. *United States,* 148 U. S. 197, 206–207, would be sufficient to sustain these convictions on the theory that petitioners were chargeable as a matter of law with notice that it was later issued.

The evidence for the Government, there being none offered by the defense, related to three time intervals: (1) the period up to June 28, 1951; (2) the four-day interval between June 28, when the proposed surrender order was served on counsel with the notice of settlement, and July 2, when the surrender order was signed; and (3) the period ending with the surrender of the petitioners—February 27, 1956, in the case of Green, and March 5, 1956, in the case of Winston.

1. The judgments of conviction upon the conspiracy indictment under the Smith Act were entered, and the

petitioners were sentenced, on October 21, 1949. On November 2, 1949, the Court of Appeals admitted the petitioners to bail pending appeal upon separate recognizances, signed by each petitioner on November 3, by which each undertook, among other things, to

"surrender himself in execution of the judgment and sentence appealed from *upon such day as the District Court* of the United States for the Southern District of New York *may direct,* if the judgment and sentence appealed from shall be affirmed . . . ." (Italics added.)

Following the Court of Appeals' affirmance of the conspiracy convictions on August 1, 1950, 183 F. 2d 201, Mr. Justice Jackson, as Circuit Justice, continued petitioners' bail on September 25, 1950, pending review of the convictions by this Court. 184 F. 2d 280. This Court, as noted above, affirmed the conspiracy convictions on June 4, 1951, and on June 22, 1951, Mr. Justice Jackson denied a stay of the Court's mandate.

2. On Thursday, June 28, 1951, one of the counsel in the *Dennis* case accepted service on behalf of all the defendants, including petitioners, of a proposed order on mandate requiring the defendants to "personally surrender to the United States Marshal for the Southern District of New York . . . on the 2nd day of July, 1951, at 11:05" a. m., together with a notice stating that the proposed order would be presented to the District Court "for settlement and signature" at 10 a. m. on that day.[5]

---

[5] This order can hardly be interpreted otherwise than as imposing on the *Dennis* defendants from the time that the order became effective on July 2 a continuing obligation to surrender promptly upon becoming aware of its effectiveness. The printed record before us indicates that the proposed order given counsel on June 28 read precisely in the form quoted in the text above, but the original copy of the order reveals that the time for surrender was first written as

It appears from the testimony of this same counsel and another *Dennis* counsel that on the following day, Friday, June 29, an unsuccessful request was made to the United States Attorney and the District Court to postpone the defendants' surrender until after the July 4 holiday; that on the same day these lawyers told the petitioners and the other *Dennis* defendants that they must be in court on Monday, July 2; and that petitioners assured counsel of their appearance on that day.[6]    On

---

"10:30" a. m., and at some later time prior to the time the order was signed was changed to read "11.05." Petitioners make no issue of this discrepancy, and we attach no significance to it.

[6] The events of June 29, 1951, were testified to in court on July 3, 1951, by petitioners' counsel, Messrs. Sacher and Isserman. By stipulation, a transcript of this testimony was introduced into evidence during the contempt proceedings in the District Court, and excerpts from the testimony follow:

The Court: "Now, you did make a statement last week that you will have the four defendants [Green, Winston, Hall and Thompson] in court, as I recall, on Monday [July 2].

"Mr. Sacher: I said that all of them would be here.

.            .            .            .            .

"The Court: And as you know, four of them were not here on Monday. Of course, you may be bound by some obligation of attorney and client, but are you able to give the Court any information as to their present whereabouts?

"Mr. Sacher: Your Honor, I should consider myself not bound by any obligation to withhold any information that I might have, and I give your Honor my assurance that I have no knowledge, I have no basis of knowledge as to their present whereabouts or where they might have gone.

"The Court: Where did you last see these four defendants?

.            .            .            .            .

"Mr. Sacher: . . . I am not certain about Thompson, but I am fairly certain that I saw the three I mentioned sometime on Friday [June 29] at 35 East Twelfth Street.

"The Court: Did you tell them at that time that their presence was required in court yesterday morning?

"Mr. Sacher: Definitely. As a matter of fact I advised that because I think I saw them among other defendants after I had

July 2 all of the *Dennis* defendants surrendered, except the two petitioners, and Hall and Thompson. The surrender order was signed, bench warrants were issued for the arrest of these four, and the proceedings were adjourned to the following day, July 3.

3. On July 3 the names of the petitioners were called again in open court, and after interrogating counsel as to their disappearance (see note 6, *supra*), the court declared their bail forfeited. The petitioners remained in hiding until their eventual surrender, some four and a half years later. Prior to their respective surrenders in February and March, 1956, Green and Winston issued press releases announcing their intention to surrender and "enter prison." [7] When he turned up on the steps of the

---

been here on Friday, your Honor, and had made these motions [apparently referring to counsel's efforts to postpone the surrender date until after July 4], and therefore I advised that they all should be present and I was assured they would be.

.        .        .        .        .

"The Court: Mr. Isserman, do you know where any of these defendants are?

"Mr. Isserman: I might say to the Court that I would not rest on privilege in this situation at all. I have no knowledge of the present whereabouts of any of these defendants. . . . I remember, Green being my client, I remember distinctly that I saw him on that day [June 29] and received from him the assurance that he would be here Monday morning [July 2]."

[7] Excerpts from Green's press release:

"On Monday, February 27th at 12 noon I shall cease being a *fugitive* from injustice and instead become its prisoner. At that time, I shall appear at Foley Square. . . . The course I chose five years ago was not dictated by personal considerations. In many ways it was *harsher than that of imprisonment.* . . . [I]t seemed incumbent upon me to resist that trend [i. e. to 'an American brand of fascism'] with every ounce of strength I possessed. Some could do so by *going to jail;* others by not. . . . *I enter prison* with head high and conscience clear." (Italics added.)

Excerpts from Winston's press release:

"Reiterating my innocence, and protesting the flagrant miscarriage

courthouse, Green also responded to certain questions put by reporters and stated, among other things, that he intended "to go to the United States Marshal's office," this being a requirement found only in the surrender order itself. Winston made a similar statement in his press release.

In summary, one day after counsel was served on June 28 with the proposed order calling for petitioners' surrender on July 2, together with the notice stating that the order would also be presented for the court's signature on that day, petitioners were unequivocally notified by counsel that their presence in court was required on July 2. From these undisputed facts, coupled with petitioners' disappearance, it was certainly permissible for the District Court to infer that petitioners knew of the proposed surrender order, of the failure of counsel's efforts on June 29 to postpone the surrender date, and of the court's intention to sign the order on July 2. We need not decide whether these facts alone would sustain the finding that petitioners knew of the issuance of the surrender order on July 2 as planned, for unquestionably as background they furnished significant support for the District Court's ultimate finding that petitioners' statements to the press at the time of their eventual surrender in 1956 (see note 7, *supra*) indicated their knowledge of the issuance of the order, a finding strengthened by the fact that the recognizance admitting the petitioners to bail obligated petitioners to surrender for service of sentence only when so directed by the District Court.

No doubt some of this evidence lent itself to conflicting inferences, but those favorable to the petitioners were, in our view, not of such strength as to compel the trier of

---

of justice in my case, *I now enter prison* . . . . I shall appear this coming Monday, March 5th, 12:30 p. m., at the U. S. Marshal's Office in Foley Square." (Italics added.)

the facts to reject alternative unfavorable inferences. Our duty as an appellate court is to assess the evidence as a whole under the rigorous standards governing criminal trials, rather than to test by those standards each item of evidence relied on by the District Court. 9 Wigmore, Evidence (3d ed. 1940), § 2497; 1 Wharton, Criminal Evidence (12th ed. 1955), § 16. So viewing the entire record, we think the District Court was justified in finding that the evidence established, beyond a reasonable doubt, petitioners' knowing violations of the surrender order.

### III.

We deal here with petitioners' claim that the District Court was without power to sentence them to imprisonment for more than one year.

Section 17 of the Judiciary Act of 1789 confirmed the power of federal courts ". . . to punish by fine or imprisonment, at the discretion of said courts . . ." certain contempts. The Act of 1831 simply referred to the power to "inflict summary punishments," and present § 401 contains substantially the above language of the Act of 1789. Petitioners contend that despite the provision for "discretion," the power to punish under § 401 is limited to one year by certain sections of the Clayton Act of 1914, 38 Stat. 730, 738–740. In any event, we are urged to read such a limitation into § 401 in order to avoid constitutional difficulties which, it is said, would otherwise confront us.

We turn first to the argument based on the Clayton Act. Sections 21 and 22 of that Act provided that certain rights not traditionally accorded persons charged with contempt, notably the right to trial by jury, should be granted in certain classes of criminal contempts, and that persons tried under these procedures were not subject to a fine of more than $1,000 or imprisonment for longer

than six months.[8] Section 24 of the Act made these provisions inapplicable to other categories of contempts, including the contempt for which the petitioners here have been convicted,[9] and provided that such excluded categories of contempts were to be punished "in conformity to the *usages* at law and in equity *now prevailing*." (Italics added.) In the recodification of 1948 the foregoing provisions of the Clayton Act were substantially re-enacted in § 402 [10] of the present contempt statute, and the above-quoted clause now reads: "in conformity to the prevailing usages at law."

Petitioners' argument is that the purpose and effect of the "usages . . . now prevailing" language of § 24 of the Clayton Act was to freeze into federal contempt law the sentencing practices of federal courts, which up to that time appear never to have imposed a contempt sentence of more than one year.[11] These practices, suggest peti-

---

[8] The substance of §§ 21 and 22 was that one charged with the commission of acts constituting willful disobedience to a lawful court order could demand a trial by jury if (§ 21) ". . . the act or thing so done by him be of such character as to constitute also a criminal offense under any statute of the United States, or under the laws of any State in which the act was committed . . . ." Section 22 provided that the jury trial ". . . shall conform, as near as may be, to the practice in criminal cases prosecuted by indictment or upon information."

[9] This section excluded from the Act, *inter alia,* contempts committed by disobedience to any court order entered in any suit or action ". . . brought or prosecuted in the name of, or on behalf of, the United States . . . ."

[10] At the present time, 18 U. S. C. § 402 contains the definitional provision formerly in § 21 of the Clayton Act and expressly refers to 18 U. S. C. § 3691, which provides that contempts falling within this definition are subject to trial by jury.

[11] Petitioners have shown us no federal decision which intimates any constitutional or common-law restriction on the *power* of federal courts to sentence for over one year. As stated by the Court of Appeals in the present case, 241 F. 2d, at 634, ". . . there is not in

tioners, reflect the unarticulated belief of federal courts that criminal contempts are not infamous crimes and hence not subject to punishment by imprisonment for over one year;[12] this belief is said to derive from the constitutional considerations to which we shortly turn. In view of this suggested effect of § 24, petitioners would have us read the "discretion" vested in federal courts by § 401 as referring exclusively to the choice between sentencing to fine or imprisonment, or in any event as subject to the unexpressed limitation of one year's imprisonment.

Particularly in the context of the rest of the Clayton Act of 1914 we cannot read the "usages . . . now prevailing" clause of § 24 as incorporating into the statute the sentencing practices up to that date. In § 22 the statute specifically restricts to six months the maximum term of imprisonment which may be imposed for commission of any of the contempts described in § 21. Had Congress also intended to restrict the term of imprisonment for contempts excluded from the operation of the Act by § 24, it is difficult to understand why it did not make explicit its intention, as it did in § 22, rather than so subtly express its purpose by proceeding in the devious manner attributed to it by the petitioners. Further, there is no evidence that the past sentencing practices of the courts were ever brought to the attention of Congress. That the federal courts themselves have not considered their sentencing power to be restricted by § 24 of the Clayton Act or by § 402 of the present contempt statute is indicated by the fact that in at least nine cases subsequent to 1914, contempt convictions carrying sentences of more than

the books a syllable of recognition of any such supposed limitation." Under English law contempt sentences were not subject to any statutory limit. See Fox, Eccentricities of the Law of Contempt of Court, 36 L. Q. Rev. 394, 398.

[12] See p. 182, *infra*.

one year have been affirmed by four different Courts of Appeals and on one occasion by this Court.[18]

Such of the legislative history as is germane here argues against the petitioners and strengthens our conclusions that the "usages . . . now prevailing" clause of § 24 of the Clayton Act did no more than emphasize that contempts other than those specified in § 21 were to be tried under familiar contempt *procedures,* that is, among other things, by the court rather than a jury. The House Report accompanying the bill which was substantially enacted as §§ 21, 22 and 24 of the Clayton Act referred to the provisions later forming these sections as dealing ". . . entirely with questions of Federal procedure relating to injunctions and contempts committed without the presence of the court." H. R. Rep. No. 627, 63d Cong., 2d Sess. 21. There is no evidence of a broader purpose to enact so substantial a rule of substantive law encompassing all criminal contempts.

We are nevertheless urged to read into § 401 a one-year limitation on the sentencing power in order to avoid constitutional issues which the petitioners deem present in the absence of such a restriction. But in view of what we have shown, the section's provision that a federal court may punish *"at its discretion"* the enumerated classes of contempts cannot reasonably be read to allow a court merely the choice between fines and imprisonment. We think the Court of Appeals correctly said: "The phrase 'at its discretion,' does not mean that the court

---

[18] *Hill* v. *United States ex rel. Weiner,* 300 U. S. 105; *United States* v. *Brown,* 247 F. 2d 332 (2d Cir.); *Lopiparo* v. *United States,* 216 F. 2d 87 (8th Cir.); *United States* v. *Thompson,* 214 F. 2d 545 (2d Cir.); *United States* v. *Hall,* 198 F. 2d 726 (2d Cir.); *United States ex rel. Brown* v. *Lederer,* 140 F. 2d 136 (7th Cir.); *Warring* v. *Huff,* 74 U. S. App. D. C. 302, 122 F. 2d 641 (D. C. Cir.); *Conley* v. *United States,* 59 F. 2d 929 (8th Cir.); *Creekmore* v. *United States,* 237 F. 743 (8th Cir.).

must choose between fine and imprisonment; the word 'or,' itself provides as much and the words, if so construed, would have been redundant. The term of imprisonment is to be as much in the court's discretion as the fine." 241 F. 2d, at 634.

We therefore turn to petitioners' constitutional arguments. The claim is that proceedings for criminal contempts, if contempts are subject to prison terms of more than one year, must be based on grand jury indictments under the clause of the Fifth Amendment providing: "No person shall be held to answer for a capital, or otherwise *infamous crime,* unless on a presentment or indictment of a Grand Jury . . . ." (Italics added.) Since an "infamous crime" within the meaning of the Amendment is one punishable by imprisonment in a penitentiary, *Mackin* v. *United States,* 117 U. S. 348, and since imprisonment in a penitentiary can be imposed only if a crime is subject to imprisonment exceeding one year, 18 U. S. C. § 4083, petitioners assert that criminal contempts if subject to such punishment are infamous crimes under the Amendment.

But this assertion cannot be considered in isolation from the general status of contempts under the Constitution, whether subject to "infamous" punishment or not. The statements of this Court in a long and unbroken line of decisions involving contempts ranging from misbehavior in court to disobedience of court orders establish beyond peradventure that criminal contempts are not subject to jury trial as a matter of constitutional right.[14]

---

[14] The following are the major opinions of this Court which have discussed the relationship between criminal contempts and jury trial and have concluded or assumed that criminal contempts are not subject to jury trial under Art. III, § 2, or the Sixth Amendment: *Savin, Petitioner,* 131 U. S. 267, 278; *Eilenbecker* v. *District Court of Plymouth County,* 134 U. S. 31, 36–39; *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 489; *In re Debs,* 158 U. S. 564, 594–596; *Bessette* v. *W. B. Conkey Co.,* 194 U. S. 324, 336–337;

Although appearing to recognize this, petitioners nevertheless point out that punishment for criminal contempts cannot in any practical sense be distinguished from punishment for substantive crimes, see *Gompers* v. *United States,* 233 U. S. 604, 610, and that contempt proceedings have traditionally been surrounded with many of the protections available in a criminal trial.[15] But this Court has never suggested that such protections included the right to grand jury indictment. Cf. *Savin, Petitioner,* 131 U. S. 267, 278; *Gompers* v. *United States, supra,* at 612. And of course the summary procedures followed by English courts prior to adoption of the Constitution in dealing with many contempts of court did not embrace the use of either grand or petit jury. See 4 Blackstone Commentaries 283–287. It would indeed be anomalous to conclude that contempts subject to sentences of imprisonment for over one year are "infamous

---

*Gompers* v. *United States,* 233 U. S. 604, 610–611; *Ex parte Hudgings,* 249 U. S. 378, 383; *Michaelson* v. *United States,* 266 U. S. 42, 67; *United States* v. *United Mine Workers,* 330 U. S. 258, 298. Although the statements contained in these cases, with few exceptions, are broadly phrased and do not refer to particular categories of criminal contempts, several of the cases involved review of contempt convictions arising out of disobedience to court orders. See in particular *In re Debs, Gompers* v. *United States,* and *United States* v. *United Mine Workers.*

For more general statements of the nature of the contempt power and its indispensability to federal courts, see *United States* v. *Hudson,* 7 Cranch 32, 34; *Ex parte Robinson,* 19 Wall. 505, 510; *Ex parte Terry,* 128 U. S. 289, 302–304; *Bessette* v. *W. B. Conkey Co., supra,* at 326; *Myers* v. *United States,* 264 U. S. 95, 103; *Michaelson* v. *United States, supra,* at 65–66.

[15] See, *e. g., Cooke* v. *United States,* 267 U. S. 517, 537 (compulsory process and assistance of counsel); *Gompers* v. *United States,* 233 U. S. 604, 611–612 (benefit of a statute of limitations generally governing crimes); *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 444 (proof of guilt beyond a reasonable doubt and freedom from compulsion to testify).

crimes" under the Fifth Amendment although they are neither "crimes" nor "criminal prosecutions" for the purpose of jury trial within the meaning of Art. III, § 2,[16] and the Sixth Amendment.[17]

We are told however that the decisions of this Court denying the right to jury trial in criminal contempt proceedings are based upon an "historical error" reflecting a misunderstanding as to the scope of the power of English courts at the early common law to try summarily for contempts, and that this error should not here be extended to a denial of the right to grand jury. But the more recent historical research into English contempt practices predating the adoption of our Constitution reveals no such clear error and indicates if anything that the precise nature of those practices is shrouded in much obscurity. And whatever the breadth of the historical error said by contemporary scholarship to have been committed by English courts of the late Seventeenth and Eighteenth Centuries in their interpretation of English precedents involving the trials of contempts of court, it at least seems clear that English practice by the early Eighteenth Century comprehended the use of summary powers of conviction by courts to punish for a variety of contempts committed within and outside court.[18] Such indeed is the

[16] "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ."

[17] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."

[18] Petitioners derive their argument as to historical error from the writings of Sir John Charles Fox. However, Fox's major effort was to show that a statement in an unpublished opinion by Wilmot, J., in *The King* v. *Almon* (1765), to the effect that summary punishment for contempts committed out of court stood upon "immemorial usage," was based on an erroneous interpretation of earlier law as applied to the case before him, namely, *contempt by libel on the*

statement of English law of this period found in Black-
stone, *supra,* p. 184, who explicitly recognized use of a sum-
mary power by English courts to deal with disobedience of
court process. It is noteworthy that the Judiciary Act of
1789, first attempting a definition of the contempt power,
was enacted by a Congress with a Judiciary Committee in-
cluding members of the recent Constitutional Convention,
who no doubt shared the prevailing views in the American
Colonies of English law as expressed in Blackstone. See
*Ex parte Burr,* 4 Fed. Cas. 791, 797 (No. 2,186). Against
this historical background, this Court has never deviated
from the view that the constitutional guarantee of trial
by jury for "crimes" and "criminal prosecutions" was not
intended to reach to criminal contempts. And indeed
beginning with the Judiciary Act of 1789, Congress has

*court* by a stranger to court proceedings. See Fox, *The King* v.
*Almon* (Parts I and II), 24 L. Q. Rev. 184, 266; Fox, The History of
Contempt of Court (1927), 5–43. That contempts committed in
the view of the court were at an early date dealt with sum-
marily is not disputed by Fox. The History of Contempt of
Court, *supra,* at 50. Insofar as Fox discusses contempts out of court
by disobedience to court orders, it is not clear whether the author
contends that such contempts were tried at early English law
under summary procedures only for *civil coercive* purposes, or
for *criminal, punitive* purposes as well. Cf. *The King* v. *Almon,*
*supra,* at 188, 277–278; and Fox, The Summary Process to Punish
Contempt (Parts I and II), 25 L. Q. Rev. 238, 354, with *The King* v.
*Almon,* at 195, 276; The Summary Process to Punish Contempt, at
249; and The History of Contempt of Court, *supra,* at 108–110. See
also Beale, Contempt of Court, 21 Harv. L. Rev. 161, 164, 169–171.
Fox concludes that by the mid-Seventeenth or early Eighteenth Cen-
tury, a variety of contempts committed outside of court were sub-
ject to punishment by the exercise of a court's summary jurisdiction.
The Summary Process to Punish Contempts, *supra,* at 252, 366, 370–
371. It appears that under present English law disobedience to court
process is but one of the many categories of contempts of court which
are dealt with summarily. 8 Halsbury, Laws of England (3d ed.
1954), 3–4, 25–26; 1 Russell, Crime (10th ed. 1950), 329–330.

consistently preserved the summary nature of the contempt power in the Act of 1831 and its statutory successors, departing from this traditional notion only in specific instances where it has provided for jury trial for certain categories of contempt.[19]

We do not write upon a clean slate. The principle that criminal contempts of court are not required to be tried by a jury under Article III or the Sixth Amendment is firmly rooted in our traditions. Indeed, the petitioners themselves have not contended that they were entitled to a jury trial. By the same token it is clear that criminal contempts, although subject, as we have held, to sentences of imprisonment exceeding one year, need not be prosecuted by indictment under the Fifth Amendment. In various respects, such as the absence of a statutory limitation of the amount of a fine or the length of a prison sentence which may be imposed for their commission, criminal contempts have always differed from the usual statutory crime under federal law. As to trial by jury and indictment by grand jury, they possess a unique character under the Constitution.[20]

## IV.

Petitioners contend that the three-year sentences imposed upon them constituted an abuse of discretion on the part of the District Court.

---

[19] See 18 U. S. C. § 402, *supra*, note 10; 18 U. S. C. § 3692 (jury trial for contempts based on violation of injunctions in cases involving labor disputes); § 151, 71 Stat. 638, 42 U. S. C. A. § 1995 (right to jury trial under provisions of the Civil Rights Act of 1957 in limited circumstances in cases of criminal contempts).

[20] This holding makes unnecessary consideration of petitioners' argument based on Rule 7 of the Federal Rules of Criminal Procedure, which falls with their constitutional argument. Rule 7 refers to criminal offenses, that is "crimes" in the constitutional sense. Criminal contempts are governed by Rule 42.

We take this occasion to reiterate our view that in the areas where Congress has not seen fit to impose limitations on the sentencing power for contempts the district courts have a special duty to exercise such an extraordinary power with the utmost sense of responsibility and circumspection. The "discretion" to punish vested in the District Courts by § 401 is not an unbridled discretion. Appellate courts have here a special responsibility for determining that the power is not abused, to be exercised if necessary by revising themselves the sentences imposed. This Court has in past cases taken pains to emphasize its concern with the use to which the sentencing power has occasionally been put, both by remanding for reconsideration of contempt sentences in light of factors it deemed important, see *Yates* v. *United States,* 355 U. S. 66; *Nilva* v. *United States,* 352 U. S. 385, and by itself modifying such sentences. See *United States* v. *United Mine Workers,* 330 U. S. 258. The answer to those who see in the contempt power a potential instrument of oppression lies in assurance of its careful use and supervision, not in imposition of artificial limitations on the power.

It is in this light that we have considered the claim that the sentences here were so excessive as to amount to an abuse of discretion. We are led to reject the claim under the facts of this case for three reasons. First, the contempt here was by any standards a most egregious one. Petitioners had been accorded a fair trial on the conspiracy charges against them and had been granted bail pending review of their convictions by the Court of Appeals and this Court. Nevertheless they absconded, and over four and a half years of hiding culminated not in a belated recognition of the authority of the court, but in petitioners' reassertion of justification for disobeying the surrender order. Second, comparing these sentences with those imposed on the other fugitives in the *Dennis*

case, the sentences here are shorter by a year than that upheld in the *Thompson* case, and no longer than that inflicted in the *Hall* case. It is true that Hall and Thompson were apprehended, but the record shows that the District Court took into account the fact that the surrender of these petitioners was voluntary; there is the further factor that the period during which petitioners remained fugitives was longer than that in either the *Hall* or *Thompson* case. Third, the sentences were well within the maximum five-year imprisonment for bail-jumping provided now by 18 U. S. C. § 3146, a statute in which Congress saw fit expressly to preserve the contempt power without enacting any limitation on contempt sentences.

In these circumstances we cannot say that the sentences imposed were beyond the bounds of the reasonable exercise of the District Court's discretion.

*Affirmed.*

MR. JUSTICE FRANKFURTER, concurring.

In joining the Court's opinion I deem it appropriate to add a few observations. Law is a social organism, and evolution operates in the sociological domain no less than in the biological. The vitality and therefore validity of law is not arrested by the circumstances of its origin. What Magna Carta has become is very different indeed from the immediate objects of the barons at Runnymede. The fact that scholarship has shown that historical assumptions regarding the procedure for punishment of contempt of court were ill-founded, hardly wipes out a century and a half of the legislative and judicial history of federal law based on such assumptions. Moreover, the most authoritative student of the history of contempt of court has impressively shown that "from the reign of Edward I it was established that the Court had power to punish summarily contempt committed . . . in the actual view of the Court." Fox, History of Contempt of Court, 49–52.

Whatever the conflicting views of scholars in construing more or less dubious manuscripts of the Fourteenth Century, what is indisputable is that from the foundation of the United States the constitutionality of the power to punish for contempt without the intervention of a jury has not been doubted. The First Judiciary Act conferred such a power on the federal courts in the very act of their establishment, 1 Stat. 73, 83, and of the Judiciary Committee of eight that reported the bill to the Senate, five members including the chairman, Senator, later to be Chief Justice, Ellsworth, had been delegates to the Constitutional Convention.[1]  In the First Congress itself no less than nineteen members, including Madison who contemporaneously introduced the Bill of Rights, had been delegates to the Convention.  And when an abuse under this power manifested itself, and led Congress to define more explicitly the summary power vested in the courts, it did not remotely deny the existence of the power but merely defined the conditions for its exercise more clearly, in an Act "declaratory of the law concerning contempts of court."  Act of Mar. 2, 1831, 4 Stat. 487.  Although the judge who had misused the power was impeached, and Congress defined the power more clearly, neither the proponents of the reform nor Congress in its corrective legislation suggested that the established law be changed by making the jury part of the procedure for the punishment of criminal contempt.  This is more significant in that such a proposal had only recently been put before Congress as part of the draft penal code of Edward Livingston of Louisiana.

Nor has the constitutionality of the power been doubted by this Court throughout its existence.  In at least two score cases in this Court, not to mention the vast mass of

---

[1] Oliver Ellsworth, Chairman, William Paterson, Caleb Strong, Richard Bassett, William Few.  1 Annals of Cong. 17.

decisions in the lower federal courts, the power to punish summarily has been accepted without question.[2]  It is

[2] *Ex parte Kearney,* 7 Wheat. 38; *In re Chiles,* 22 Wall. 157; *Ex parte Terry,* 128 U. S. 289; *In re Savin,* 131 U. S. 267; *In re Cuddy,* 131 U. S. 280; *In re Swan,* 150 U. S. 637; *In re Debs,* 158 U. S. 564; *Brown* v. *Walker,* 161 U. S. 591; *In re Lennon,* 166 U. S. 548; *Bessette* v. *W. B. Conkey Co.,* 194 U. S. 324; *Nelson* v. *United States,* 201 U. S. 92; *United States* v. *Shipp,* 203 U. S. 563, 214 U. S. 386; *Ex parte Young,* 209 U. S. 123; *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402; *Blair* v. *United States,* 250 U. S. 273; *Craig* v. *Hecht,* 263 U. S. 255; *Brown* v. *United States,* 276 U. S. 134; *Sinclair* v. *United States,* 279 U. S. 749; *Blackmer* v. *United States,* 284 U. S. 421; *Clark* v. *United States,* 289 U. S. 1; *United States* v. *United Mine Workers,* 330 U. S. 258; *Rogers* v. *United States,* 340 U. S. 367; *Sacher* v. *United States,* 343 U. S. 1; *Nilva* v. *United States,* 352 U. S. 385; *Yates* v. *United States,* 355 U. S. 66.

In the following cases the Court, although refusing to sustain contempt convictions for other reasons, took for granted trial by the court without a jury: *Ex parte Robinson,* 19 Wall. 505; *In re Burrus,* 136 U. S. 586; *Wilson* v. *North Carolina,* 169 U. S. 586; *In re Watts,* 190 U. S. 1; *Baglin* v. *Cusenier Co.,* 221 U. S. 580; *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418; *Ex parte Hudgings,* 249 U. S. 378; *Cooke* v. *United States,* 267 U. S. 517; *Nye* v. *United States,* 313 U. S. 33; *Pendergast* v. *United States,* 317 U. S. 412; *United States* v. *White,* 322 U. S. 694; *In re Michael,* 326 U. S. 224; *Blau* v. *United States,* 340 U. S. 332; *Hoffman* v. *United States,* 341 U. S. 479; *Cammer* v. *United States,* 350 U. S. 399.

The materials on the basis of which this unbroken course of adjudication is proposed to be reversed have in fact been known in this country for almost half a century and were available to the Justices who participated in many of these decisions.  The first of the studies of criminal contempt by Sir John Charles Fox, *The King* v. *Almon,* 24 Law Q. Rev. 184, appeared in 1908, and the results of the research of Solly-Flood were published as early as 1886.  The Story of Prince Henry of Monmouth and Chief-Justice Gascoign, 3 Transactions of the Royal Historical Society (N. S.) 47.  Mr. Justice Holmes, writing for the Court in *Gompers* v. *United States,* 233 U. S. 604 (1914), noted the work of Solly-Flood.  He observed that: "It does not follow that contempts of the class under consideration are not crimes, or rather, in the language of the statute, offenses, because trial by jury as it has been gradually worked out and fought out has been thought not to extend to them as a matter of constitutional right.  These

relevant to call the roll of the Justices, not including those now sitting, who thus sustained the exercise of this power:

| | | |
|---|---|---|
| Washington | Gray | Pitney |
| Marshall | Blatchford | McReynolds |
| Johnson | L. Q. C. Lamar | Brandeis |
| Livingston | Fuller | Clarke |
| Todd | Brewer | Taft |
| Story | Brown | Sutherland |
| Duval | Shiras | Butler |
| Clifford | H. E. Jackson | Sanford |
| Swayne | White | Stone |
| Miller | Peckham | Roberts |
| Davis | McKenna | Cardozo |
| Field | Holmes | Reed |
| Strong | Day | Murphy |
| Bradley | Moody | R. H. Jackson |
| Hunt | Lurton | Rutledge |
| Waite | Hughes | Vinson |
| Harlan | Van Devanter | Minton [3] |
| Matthews | J. R. Lamar | |

To be sure, it is never too late for this Court to correct a misconception in an occasional decision, even on a rare occasion to change a rule of law that may have long persisted but also have long been questioned and only fluctuatingly applied. To say that everybody on the Court

---

contempts are infractions of the law, visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes as that word has been understood in English speech. So truly are they crimes that it seems to be proved that in the early law they were punished only by the usual criminal procedure, 3 Transactions of the Royal Historical Society, N. S. p. 147 (1885), and that at least in England it seems that they still may be and preferably are tried in that way." 233 U. S., at 610–611.

[3] Beginning with *Ex parte Robinson,* 19 Wall. 505, and *In re Chiles,* 22 Wall. 157, this list includes every Justice who sat on the Court since 1874, with the exception of Mr. Justice Woods (1881–1887), and Mr. Justice Byrnes (1941–1942).

has been wrong for 150 years and that that which has been deemed part of the bone and sinew of the law should now be extirpated is quite another thing.   Decision-making is not a mechanical process, but neither is this Court an originating lawmaker.   The admonition of Mr. Justice Brandeis that we are not a third branch of the Legislature should never be disregarded.   Congress has seen fit from time to time to qualify the power of summary punishment for contempt that it gave the federal courts in 1789 by requiring in explicitly defined situations that a jury be associated. with the court in determining whether there has been a contempt.   See, e. g., 18 U. S. C. § 3691; Civil Rights Act of 1957, 71 Stat. 634, 638, 42 U. S. C. A. § 1995. It is for Congress to extend this participation of the jury, whenever it sees fit to do so, to other instances of the exercise of the power to punish for contempt.   It is not for this Court to fashion a wholly novel constitutional doctrine that would require such participation whatever Congress may think on the matter, and in the teeth of an unbroken legislative and judicial history from the foundation of the Nation.[4]

MR. JUSTICE BLACK, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS concur, dissenting.

The power of a judge to inflict punishment for criminal contempt by means of a summary proceeding stands as an anomaly in the law.[1]   In my judgment the time has

---

[4] "We do not write on a blank sheet.   The Court has its jurisprudence, the helpful repository of the deliberate and expressed convictions of generations of sincere minds addressing themselves to exposition and decision, not with the freedom of casual critics or even of studious commentators, but under the pressure and within the limits of a definite official responsibility."   Chief Justice Hughes speaking on the occasion of the 150th anniversary of the Court. 309 U. S. xiv.

[1] The term "summary proceeding" (or "summary trial") is used in its ordinary sense to refer to a "form of trial in which the ancient established course of legal proceedings is disregarded, especially in

come for a fundamental and searching reconsideration of the validity of this power which has aptly been characterized by a State Supreme Court as, "perhaps, nearest akin to despotic power of any power existing under our form of government." [2] Even though this extraordinary authority first slipped into the law as a very limited and insignificant thing, it has relentlessly swollen, at the hands of not unwilling judges, until it has become a drastic and pervasive mode of administering criminal justice usurping our regular constitutional methods of trying those charged with offenses against society. Therefore to me this case involves basic questions of the highest importance far transcending its particular facts. But the specific facts do provide a striking example of how the great procedural safeguards erected by the Bill of Rights are now easily evaded by the ever-ready and boundless expedients of a judicial decree and a summary contempt proceeding.

I would reject those precedents which have held that the federal courts can punish an alleged violation outside the courtroom of their decrees by means of a summary trial, at least as long as they can punish by severe prison sentences or fines as they now can and do.[3] I

---

the matter of trial by jury, and, in the case of the heavier crimes, presentment by a grand jury." 3 Bouvier's Law Dictionary (8th ed. 1914) 3182. Of course as the law now stands contempts committed in the presence of the judge may be punished without any hearing or trial at all, summary or otherwise. For a flagrant example see *Sacher* v. *United States,* 343 U. S. 1.

[2] *State ex rel. Ashbaugh* v. *Circuit Court,* 97 Wis. 1, 8, 72 N. W. 193, 194–195.

[3] The precedents are adequately collected in note 14 of the Court's opinion.

Much of what is said in this opinion is equally applicable to contempts committed in the presence of the court. My opposition to summary punishment for those contempts was fully set forth in my dissent in *Sacher* v. *United States,* 343 U. S. 1, 14.

would hold that the defendants here were entitled to be tried by a jury after indictment by a grand jury and in full accordance with all the procedural safeguards required by the Constitution for "all criminal prosecutions." I am convinced that the previous cases to the contrary are wrong—wholly wrong for reasons which I shall set out in this opinion.

Ordinarily it is sound policy to adhere to prior decisions but this practice has quite properly never been a blind, inflexible rule. Courts are not omniscient. Like every other human agency, they too can profit from trial and error, from experience and reflection. As others have demonstrated, the principle commonly referred to as *stare decisis* has never been thought to extend so far as to prevent the courts from correcting their own errors. Accordingly, this Court has time and time again from the very beginning reconsidered the merits of its earlier decisions even though they claimed great longevity and repeated reaffirmation. See, *e. g., Erie Railroad Co.* v. *Tompkins,* 304 U. S. 64; *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466; *Nye* v. *United States,* 313 U. S. 33.[4] Indeed, the Court has a special responsibility where questions of constitutional law are involved to review its decisions from time to time and where compelling reasons present themselves to refuse to follow erroneous precedents; otherwise its mistakes in interpreting the Constitution are extremely difficult to alleviate and needlessly so. See *Burnet* v. *Coronado Oil & Gas Co.,* 285 U. S. 393, 405

---

[4] "I . . . am quite willing that it be regarded hereafter as the law of this court, that its opinion upon the construction of the Constitution is always open to discussion when it is supposed to have been founded in error, and that its judicial authority should hereafter depend altogether on the force of the reasoning by which it is supported." Chief Justice Taney, *Passenger Cases,* 7 How. 283, 470 (dissenting opinion).

(Brandeis, J., dissenting); Douglas, Stare Decisis, 49 Col. L. Rev. 735.

If ever a group of cases called for reappraisal it seems to me that those approving summary trial of charges of criminal contempt are the ones. The early precedents which laid the groundwork for this line of authorities were decided before the actual history of the procedures used to punish contempt was brought to light, at a time when "[w]holly unfounded assumptions about 'immemorial usage' acquired a factitious authority and were made the basis of legal decisions." [5] These cases erroneously assumed that courts had always possessed the power to punish all contempts summarily and that it inhered in their very being without supporting their suppositions by authority or reason. Later cases merely cite the earlier ones in a progressive cumulation while uncritically repeating their assumptions about "immemorial usage" and "inherent necessity." [6]

---

[5] Frankfurter and Landis, Power to Regulate Contempts, 37 Harv. L. Rev. 1010, 1011.

It also seems significant that the initial decisions by this Court actually upholding the power of the federal courts to punish contempts by summary process were not made until as late as the final decades of the last century, almost a full century after the adoption of the Constitution. Since that time the power has been vigorously challenged on a number of occasions. See, *e. g., Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, 425 (dissenting opinion); *Sacher* v. *United States,* 343 U. S. 1, 14 (dissenting opinion). Within the past few years there has been a tendency on the part of this Court to restrict the substantive scope of the contempt power to narrower bounds than had been formerly thought to exist. See, *e. g., Nye* v. *United States,* 313 U. S. 33; *Bridges* v. *California,* 314 U. S. 252; *In re Michael,* 326 U. S. 224; *Cammer* v. *United States,* 350 U. S. 399. Cf. *In re Oliver,* 333 U. S. 257. In substantial part this is attributable to a deeply felt antipathy toward the arbitrary procedures now used to punish contempts.

[6] Perhaps the classic example is the much criticized decision in *In re Debs,* 158 U. S. 564. For some of the milder comment see

No justified expectations would be destroyed by the course I propose. There has been no heavy investment in reliance on the earlier cases; they do not remotely lay down rules to guide men in their commercial or property affairs. Instead they concern the manner in which persons are to be tried by the Government for their alleged crimes. Certainly in this area there is no excuse for the perpetuation of past errors, particularly errors of great continuing importance with ominous potentialities. Apparently even the majority recognizes the need for some kind of reform by engrafting the requirement that punishment for contempt must be "reasonable"—that irrepressible, vague and delusive standard which at times threatens to engulf the entire law, including the Constitution itself, in a sea of judicial discretion.[7] But this trifling amelioration does not strike at the heart of the problem and can easily come to nothing, as the majority's very approval of the grossly disproportionate sentences imposed on these defendants portends.

Before going any further, perhaps it should be emphasized that we are not at all concerned with the power of courts to impose conditional imprisonment for the purpose of compelling a person to obey a valid order. Such coercion, where the defendant carries the keys to freedom in his willingness to comply with the court's directive, is essentially a civil remedy designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees. See *United States* v. *United Mine Workers of America,* 330

---

Lewis, A Protest Against Administering Criminal Law by Injunction—The Debs Case, 42 Am. L. Reg. 879; Lewis, Strikes and Courts of Equity, 46 Am. L. Reg. 1; Dunbar, Government by Injunction, 13 L. Q. Rev. 347; Gregory, Government by Injunction, 11 Harv. L. Rev. 487.

[7] *E. g.,* see *Beauharnais* v. *Illinois,* 343 U. S. 250; *Perez* v. *Brownell, ante,* p. 44.

U. S. 258, 330–332 (dissenting and concurring opinion). Instead, at stake here is the validity of a criminal conviction for disobedience of a court order punished by a long, fixed term of imprisonment. In my judgment the distinction between conditional confinement to compel future performance and unconditional imprisonment designed to punish past transgressions is crucial, analytically as well as historically, in determining the permissible mode of trial under the Constitution.

Summary trial of criminal contempt, as now practiced, allows a single functionary of the state, a judge, to lay down the law, to prosecute those who he believes have violated his command (as interpreted by him), to sit in "judgment" on his own charges, and then within the broadest kind of bounds to punish as he sees fit. It seems inconsistent with the most rudimentary principles of our system of criminal justice, a system carefully developed and preserved throughout the centuries to prevent oppressive enforcement of oppressive laws, to concentrate this much power in the hands of any officer of the state. No official, regardless of his position or the purity and nobleness of his character, should be granted such autocratic omnipotence. Indeed if any other officer were presumptuous enough to claim such power I cannot believe the courts would tolerate it for an instant under the Constitution. Judges are not essentially different from other government officials. Fortunately they remain human even after assuming their judicial duties. Like all the rest of mankind they may be affected from time to time by pride and passion, by pettiness and bruised feelings, by improper understanding or by excessive zeal. Frank recognition of these common human characteristics, as well as others which need not be mentioned, undoubtedly led to the determination of those who formed our Constitution to fragment power, especially the power to define and enforce the criminal law, among dif-

ferent departments and institutions of government in the hope that each would tend to operate as a check on the activities of the others and a shield against their excesses thereby securing the people's liberty.

When the responsibilities of lawmaker, prosecutor, judge, jury and disciplinarian are thrust upon a judge he is obviously incapable of holding the scales of justice perfectly fair and true and reflecting impartially on the guilt or innocence of the accused.[8]  He truly becomes the judge of his own cause.  The defendant charged with criminal contempt is thus denied what I had always thought to be an indispensable element of due process of law—an objective, scrupulously impartial tribunal to determine whether he is guilty or innocent of the charges filed against him. In the words of this Court: "A fair trial in a fair tribunal is a basic requirement of due process.  Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.  To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. . . . Fair trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer." *In re Murchison,* 349 U. S. 133, 136–137.  Cf. *Chambers* v. *Florida,* 309 U. S. 227, 236–237; *Tumey* v. *Ohio,* 273 U. S. 510; *In re Oliver,* 333 U. S. 257.

The vices of a summary trial are only aggravated by the fact that the judge's power to punish criminal contempt is exercised without effective external restraint.  First, the substantive scope of the offense of contempt is inor-

[8] A series of recent cases in this Court alone indicates that the personal emotions or opinions of judges often become deeply involved in the punishment of an alleged contempt.  See, *e. g., Fisher* v. *Pace,* 336 U. S. 155; *Sacher* v. *United States,* 343 U. S. 1; *Offutt* v. *United States,* 348 U. S. 11; *Nilva* v. *United States,* 352 U. S. 385; *Yates* v. *United States,* 355 U. S. 66.

dinately sweeping and vague; it has been defined, for example, as "any conduct that tends to bring the authority and administration of the law into disrespect or disregard." [9]  It would be no overstatement therefore to say that the offense with the most ill-defined and elastic contours in our law is now punished by the harshest procedures known to that law.  Secondly, a defendant's principal assurance that he will be fairly tried and punished is the largely impotent review of a cold record by an appellate court, another body of judges.  Once in a great while a particular appellate tribunal basically hostile to summary proceedings will closely police contempt trials but such supervision is only isolated and fleeting.  All too often the reviewing courts stand aside readily with the formal declaration that "the trial judge has not abused his discretion."  But even at its rare best appellate review cannot begin to take the place of trial in the first instance by an impartial jury subject to review on the spot by an uncommitted trial judge.  Finally, as the law now stands there are no limits on the punishment a judge can impose on a defendant whom he finds guilty of contempt except for whatever remote restrictions exist in the Eighth Amendment's prohibition against cruel and unusual punishments or in the nebulous requirements of "reasonableness" now promulgated by the majority.

In my view the power of courts to punish criminal contempt by summary trial, as now exercised, is precisely the kind of arbitrary and dangerous power which our forefathers both here and abroad fought so long, so bitterly, to stamp out.  And the paradox of it all is that the courts were established and are maintained to provide impartial tribunals of strictly disinterested arbiters to resolve charges of wrongdoing between citizen and citizen or citizen and state.

---

[9] Oswald, Contempt of Court (3d ed. 1911), 6.

The Constitution and Bill of Rights declare in sweeping unequivocal terms that "The Trial of all Crimes . . . shall be by Jury," that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury," and that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." As it may now be punished criminal contempt is manifestly a crime by every relevant test of reason or history. It was always a crime at common law punishable as such in the regular course of the criminal law.[10] It possesses all of the earmarks commonly attributed to a crime. A mandate of the Government has allegedly been violated for which severe punishment, including long prison sentences, may be exacted—punishment aimed at chastising the violator for his disobedience.[11] As Mr. Justice Holmes irrefutably observed for the Court in *Gompers* v. *United States*, 233 U. S. 604, at 610–611: "These contempts are infractions of the law, visited with punishment as such. If such acts are not criminal, we are in error as to the most fundamental characteristic of crimes as that word has been understood in English speech. So truly are they crimes that it seems to be proved that in the early law they were punished only

---

[10] See pp. 202–213, *infra*.

[11] In accordance with established usage 18 U. S. C. § 1 defines a felony as any "offense punishable by death or imprisonment for a term exceeding one year." By this standard the offense of contempt is not only a crime, but a felony—a crime of the gravest and most serious kind.

Of course if the maximum punishment for criminal contempt were sufficiently limited that offense might no longer fall within the category of "crimes"; instead it might then be regarded, in the light of our previous decisions, as a "petty" or "minor" offense for which the defendant would not necessarily be entitled to trial by jury. See *District of Columbia* v. *Clawans*, 300 U. S. 617; *Callan* v. *Wilson*, 127 U. S. 540.

by the usual criminal procedure . . . and that at least in England it seems that they still may be and preferably are tried in that way." [12]

This very case forcefully illustrates the point. After surrendering the defendants were charged with fleeing from justice, convicted, and given lengthy prison sentences designed to punish them for their flight. Identical flight has now been made a statutory crime by the Congress with severe penalties.[13] How can it possibly be any more of a crime to be convicted of disobeying a statute and sent to jail for three years than to be found guilty of violating a judicial decree forbidding precisely the same conduct and imprisoned for the same term?

The claim has frequently been advanced that courts have exercised the power to try all criminal contempts summarily since time immemorial and that this mode of trial was so well established and so favorably regarded at the time the Constitution was adopted that it was carried forward intact, by implication, despite the express provisions of the Bill of Rights requiring a completely different and fairer kind of trial for "all crimes." The myth of immemorial usage has been exploded by recent scholarship as a mere fiction. Instead it seems clear that until at least the late Seventeenth or early Eighteenth Century the English courts, with the sole exception of the extraordinary and ill-famed Court of Star Chamber whose arbitrary procedures and gross excesses brought forth many of

---

[12] Cf. *New Orleans* v. *Steamship Co.*, 20 Wall. 387, 392 ("Contempt of court is a specific criminal offence."). And see *Michaelson* v. *United States ex rel. Chicago, St. P., M. & O. R. Co.*, 266 U. S. 42, 66–67; *Pendergast* v. *United States*, 317 U. S. 412, 417–418.

"Since a charge of criminal contempt is essentially an accusation of crime, all the constitutional safeguards available to an accused in a criminal trial should be extended to prosecutions for such contempt." Frankfurter and Greene, The Labor Injunction, 226.

[13] 18 U. S. C. § 3146.

the safeguards included in our Constitution, neither had nor claimed power to punish contempts committed out of court by summary process. Fox, The History of Contempt of Court; Frankfurter and Landis, Power to Regulate Contempts, 37 Harv. L. Rev. 1010, 1042–1052; Beale, Contempt of Court, Criminal and Civil, 21 Harv. L. Rev. 161. Prior to this period such contempts were tried in the normal and regular course of the criminal law, including trial by jury.[14] After the Star Chamber was abolished in 1641 the summary contempt procedures utilized by that odious instrument of tyranny slowly began to seep into the common-law courts where they were embraced by judges not averse to enhancing their own power. Still for decades the instances where such irregular procedures were actually applied remained few and far between and limited to certain special situations.

Then in 1765 Justice Wilmot declared in an opinion prepared for delivery in the Court of King's Bench (but never actually handed down) that courts had exercised the power to try all contempts summarily since their creation in the forgotten past. Although this bald assertion has been wholly discredited by the painstaking research of the eminent authorities referred to above, and even though Wilmot's opinion was not published until some years after our Constitution had been adopted, nor cited as authority by any court until 1821, his views have nevertheless exerted a baleful influence on the law of contempt both in this country and in England.

---

[14] One scholar has argued that even contempts in the face of the courts were tried by jury after indictment by grand jury until the reign of Elizabeth I. Solly-Flood, Prince Henry of Monmouth and Chief Justice Gascoign, 3 Transactions of the Royal Historical Society (N. S.) 47. Although agreeing that contempts in facie were often tried by a jury up to and beyond this period, Fox takes the view that such contempts were also punishable by summary procedures from the early common law.

By the middle of the last century the English courts had come to accept fully his thesis that they inherently possessed power to punish all contempts summarily, in or out of court. Yet even then contempts were often punished by the regular criminal procedures so that this Court could report as late as 1913 that they were still preferably tried in that manner. *Gompers* v. *United States*, 233 U. S. 604, 611.[15]

The Government, relying solely on certain obscure passages in some early law review articles by Fox, contends that while the common-law courts may not have traditionally possessed power to punish all criminal contempts without a regular trial they had always exercised such authority with respect to disobedience of their decrees. I do not believe that the studies of Fox or of other students of the history of contempt support any such claim. As I understand him, Fox reaches precisely the opposite conclusion. In his authoritative treatise, expressly written to elaborate and further substantiate the opinions formed in his earlier law review comments, he states clearly at the outset:

> "The first of [this series of earlier articles], entitled *The King* v. *Almon,* was written to show that in former times the offence of contempt committed out of court was tried by a jury in the ordinary course of law and not summarily by the Court as at present [1927]. The later articles also bear upon the history of the procedure in matters of contempt. Further

---

[15] In passing it is interesting to note that even Wilmot felt obliged to bolster his position by pointing to the fact that a defendant, under a notion then prevalent, could exonerate himself from a charge of contempt by fully denying the charges under oath. In this event he could only be prosecuted for false swearing in which case he was entitled, as Wilmot elaborately observes, to trial by jury. See Curtis and Curtis, The Story of a Notion in the Law of Criminal Contempt, 41 Harv. L. Rev. 51.

inquiry confirmed the opinion originally formed with regard to the trial of contempt and brought to light a considerable amount of additional evidence which, with the earlier matter, is embodied in the following chapters . . . ." [16]

Then in summarizing he asserts that strangers to court proceedings were never punished except by the ordinary processes of the criminal law for contempts committed out of the court's presence until some time after the dissolution of the Star Chamber; he immediately follows with the judgment that parties were governed by the same general rules that applied to strangers. [17]  Of course he recognizes the antiquity of the jurisdiction of courts to enforce their orders by conditional confinement, but such coercion, as pointed out before, is obviously something quite different from the infliction of purely punitive penalties for criminal contempt when compliance is no longer possible.

Professors Frankfurter and Landis in their fine article likewise unequivocally declare:

". . . the Clayton Act [providing for jury trial of certain charges of criminal contempt] does nothing new.  It is as old as the best traditions of the common law. . . .

"Down to the early part of the eighteenth century cases of contempt even in and about the common-law courts when not committed by persons officially connected with the court were dealt with by the ordinary course of law, i. e., tried by jury, except when the offender confessed or when the offense was committed 'in the actual view of the court.' . . .

.          .          .          .          .

---

[16] Fox, The History of Contempt of Court, vii.

[17] Id., at 116–117.  See also, id., at 3–4, 13, 54–55, 71–72, 89.

"[U]ntil 1720 there is no instance in the common-law precedents of punishment otherwise than after trial in the ordinary course and not by summary process." [18]

And Professor Beale in his discussion of the matter concludes:

"As early as the time of Richard III it was said that the chancellor of England compels a party against whom an order is issued by imprisonment; and a little later it was said in the chancery that 'a decree does not bind the right, but only binds the person to obedience, so that if the party will not obey, then the chancellor may commit him to prison till he obey, and that is all the chancellor can do.' This imprisonment was by no means a punishment, but was merely to secure obedience to the writ of the king. Down to within a century [Beale was writing in 1908] it was very doubtful if the chancellor could under any circumstances inflict punishment for disobedience of a decree. . . . In any case the contempt of a defendant who had violated a decree in chancery could be purged by doing the act commanded and paying costs; . . . .

.        .        .        .        .

"Where the court inflicts a definite term of imprisonment by way of punishment for the violation of its orders, the case does not differ, it would seem, from the case of criminal contempt out of court, and regular process and trial by jury should be required." [19]

In brief the available historical material as reported and analyzed by the recognized authorities in this field

[18] Power to Regulate Contempts, 37 Harv. L. Rev. 1010, 1042, 1046.

[19] Contempt of Court, Criminal and Civil, 21 Harv. L. Rev. 161, 169–170, 174.

squarely refutes the Government's insistence that disobedience of a court order has always been an exception punishable by summary process. Insofar as this particular case is concerned, the Government frankly concedes that it cannot point to a single instance in the entire course of Anglo-American legal history prior to this prosecution and two related contemporary cases where a defendant has been punished for criminal contempt by summary trial after fleeing from court-ordered imprisonment.[20]

Those who claim that the delegates who ratified the Constitution and its contemporaneous Amendments intended to exempt the crime of contempt from the procedural safeguards expressly established by those great charters for the trial of "all crimes" carry a heavy burden indeed. There is nothing in the Constitution or any of its Amendments which even remotely suggests such an exception. And as the Government points out in its brief, it does not appear that there was a word of discussion in the Constitutional Convention or in any of the state ratifying conventions recognizing or affirming the jurisdiction of courts to punish this crime by summary process, a power which in all particulars is so inherently alien to the method of punishing other public offenses provided by the Constitution.

In the beginning the contempt power with its essentially arbitrary procedures was a petty, insignificant part of our law involving the use of trivial penalties to preserve order in the courtroom and maintain the authority of the courts.[21] But since the adoption of the Constitu-

---

[20] See *United States* v. *Thompson,* 214 F. 2d 545; *United States* v. *Hall,* 198 F. 2d 726.

[21] Although records of the colonial era are extremely fragmentary and inaccessible apparently such contempts as existed were not the subject of major punishment in that period. From the scattered reported cases it appears that alleged offenders were let off after an

tion it has undergone an incredible transformation and growth, slowly at first and then with increasing acceleration, until it has become a powerful and pervasive device for enforcement of the criminal law. It is no longer the same comparatively innocuous power that it was. Its summary procedures have been pressed into service for such far-flung purposes as to prevent "unlawful" labor practices, to enforce the prohibition laws, to secure civil liberties and now, for the first time in our history, to punish a convict for fleeing from imprisonment.[22] In brief it has become a common device for by-passing the constitutionally prescribed safeguards of the regular criminal law in punishing public wrongs. But still worse, its subversive potential to that end appears to be virtually unlimited. All the while the sentences imposed on those found guilty of contempt have steadily mounted, until now they are even imprisoned for years.

I cannot help but believe that this arbitrary power to punish by summary process, as now used, is utterly irreconcilable with first principles underlying our Constitution and the system of government it created— principles which were uppermost in the minds of the gen-

---

apology, a reprimand or a small fine or other relatively slight punishment. I have found no instance where anyone was unconditionally imprisoned for even a term of months, let alone years, during that era when extremely harsh penalties were otherwise commonplace.

[22] The following are merely random samples of important and far-reaching federal regulatory Acts now in effect under which a violation of any provision of the Act is not only a statutory crime punishable as such but also may be enjoined at the Government's request and punished as a criminal contempt by summary process if the injunction is disobeyed. Securities Exchange Act, 48 Stat. 900, 15 U. S. C. § 78u; Natural Gas Act, 52 Stat. 832, 15 U. S. C. § 717s; Fair Labor Standards Act, 52 Stat. 1069, 29 U. S. C. § 217; Atomic Energy Act, 68 Stat. 959, 42 U. S. C. (Supp. IV) § 2280; Federal Communications Act, 48 Stat. 1092, 47 U. S. C. § 401; Defense Production Act of 1950, 64 Stat. 817, 50 U. S. C. App. § 2156.

eration that adopted the Constitution. Above all that generation deeply feared and bitterly abhorred the existence of arbitrary, unchecked power in the hands of any government official, particularly when it came to punishing alleged offenses against the state. A great concern for protecting individual liberty from even the possibility of irresponsible official action was one of the momentous forces which led to the Bill of Rights. And the Fifth, Sixth, Seventh and Eighth Amendments were directly and purposefully designed to confine the power of courts and judges, especially with regard to the procedures used for the trial of crimes.

As manifested by the Declaration of Independence, the denial of trial by jury and its subversion by various contrivances was one of the principal complaints against the English Crown. Trial by a jury of laymen and no less was regarded as the birthright of free men.[23] Witness the fierce opposition of the colonials to the courts of admiralty in which judges instead of citizen juries were authorized to try those charged with violating certain laws.[24] The same zealous determination to protect jury trial dominated the state conventions which ratified the Constitution and eventually led to the solemn reaffirmation of that mode of trial in the Bill of Rights—not only for all criminal prosecutions but for all civil causes involving $20 or more. See 2 Story, Commentaries on the Constitution (5th ed. 1891), §§ 1763–1768. I find it difficult

---

[23] As early as 1765 delegates from nine colonies meeting in New York declared in a Declaration of Rights that trial by jury was the "inherent and invaluable right" of every colonial. 43 Harvard Classics 147, 148.

[24] In 1775 Jefferson protested: "[Parliament has] extended the jurisdiction of the courts of admiralty beyond their antient limits thereby depriving us of the inestimable right of trial by jury in cases affecting both life and property and subjecting both to the decision arbitrary decision [sic] of a single and dependent judge." 2 Journals of the Continental Congress (Ford ed.) 132.

to understand how it can be maintained that the same people who manifested such great concern for trial by jury as to explicitly embed it in the Constitution for every $20 civil suit could have intended that this cherished method of trial should not be available to those threatened with long imprisonment for the crime of contempt. I am confident that if there had been any inkling that the federal courts established under the Constitution could impose heavy penalties, as they now do, for violation of their sweeping and far-ranging mandates without giving the accused a fair trial by his fellow citizens it would have provoked a storm of protest, to put it mildly. Would any friend of the Constitution have been foolhardy enough to take the floor of the ratifying convention in Virginia or any of a half dozen other States and even suggest such a possibility? [25]

As this Court has often observed, "The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning," *United States v. Sprague,* 282 U. S. 716, 731; ". . . constitutions, although framed by conventions, are yet created by the votes of the entire body of electors in a State, the most of whom are little disposed, even if they were able, to engage in such refinements. The simplest and most obvious interpretation of a constitution, if in itself sensible, is the

---

[25] Although Section 17 of the Judiciary Act of 1789, 1 Stat. 73, 83, authorized the federal courts to punish contempts "in any cause or hearing before the same," it did not, as this Court has pointed out, define what were contempts or prescribe the method of punishing them. *Savin, Petitioner,* 131 U. S. 267, 275. Section 17, which contains a number of other provisions, appears to have been a comparatively insignificant provision of the judicial code enacted by the Congress without material discussion in the midst of 34 other sections, many of which were both extremely important and highly controversial.

most likely to be that meant by the people in its adoption," *Lake County* v. *Rollins,* 130 U. S. 662, 671. Cf. Mr. Justice Holmes in *Eisner* v. *Macomber,* 252 U. S. 189, 219–220 (dissenting opinion). It is wholly beyond my comprehension how the generality of laymen, or for that matter even thoughtful lawyers, either at the end of the Eighteenth Century or today, could possibly see an appreciable difference between the crime of contempt, at least as it has now evolved, and other major crimes, or why they would wish to draw any distinction between the two so far as basic constitutional rights were concerned.

It is true that Blackstone in his Commentaries incorporated Wilmot's erroneous fancy that at common law the courts had immemorially punished all criminal contempts without regular trial. Much ado is made over this by the proponents of summary proceedings. Yet at the very same time Blackstone openly classified and uniformly referred to contempt as a "crime" throughout his treatise, as in fact it had traditionally been regarded and punished at common law.[26] Similarly, other legal treatises available in this country during the period when the Constitution was established plainly treated contempt as a "crime."[27] It seems to me that if any guide to the meaning of the Constitution can be fashioned from the circulation of the Commentaries and these other legal authorities through the former colonies (primarily among lawyers and judges) it is at least as compatible with the

---

[26] See, *e. g.,* 4 Blackstone's Commentaries 1–6, 119–126, 280–287. Also pertinent here is Blackstone's oft-quoted laudation of trial by jury "as the glory of the English law. . . . [I]t is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbours and equals." 3 *id.,* at 379.

[27] See, *e. g.,* 1 Hawkins, Pleas of the Crown (6th ed. 1787), 87.

view that the Constitution requires a jury trial for criminal contempts as with the contrary notion.

But far more significant, our Constitution and Bill of Rights were manifestly not designed to perpetuate, to preserve inviolate, every arbitrary and oppressive governmental practice then tolerated, or thought to be, in England. Cf. *Bridges* v. *California,* 314 U. S. 252, 263–268. Those who formed the Constitution struck out anew free of previous shackles in an effort to obtain a better order of government more congenial to human liberty and welfare. It cannot be seriously claimed that they intended to adopt the common law wholesale. They accepted those portions of it which were adapted to this country and conformed to the ideals of its citizens and rejected the remainder. In truth there was widespread hostility to the common law in general and profound opposition to its adoption into our jurisprudence from the commencement of the Revolutionary War until long after the Constitution was ratified. As summarized by one historian:

> "The Revolutionary War made everything connected with the law of England distasteful to the people at large. The lawyers knew its value: the community did not. Public sentiment favored an American law for America. It was quickened by the unfriendly feeling toward the mother country which became pronounced toward the close of the eighteenth century and culminated in the War of 1812." [28]

---

[28] Baldwin, The American Judiciary, 14.

"After the Revolution the public was extremely hostile to England and to all that was English and it was impossible for the common law to escape the odium of its English origin." Pound, The Spirit of the Common Law, 116. And see Warren, History of the American Bar, 224–228.

Although the bench and bar, particularly those who were adherents to the principles of the Federalist Party, often favored carrying foward the common law to the fullest possible extent popular sentiment was overwhelmingly against them.[29]

Apologists for summary trial of the crime of contempt also endeavor to justify it as a "necessity" if judicial orders are to be observed and the needful authority of the courts maintained. "Necessity" is often used in this context as convenient or desirable. But since we are dealing with an asserted power which derogates from and is fundamentally inconsistent with our ordinary, constitutionally prescribed methods of proceeding in criminal cases, "necessity," if it can justify at all, must at least refer to a situation where the extraordinary power to punish by summary process is clearly indispensable to the enforcement of court decrees and the orderly administration of justice. Or as this Court has repeatedly phrased it, the courts in punishing contempts should be rigorously restricted to the "least possible power adequate to the end proposed." See, e. g., In re Michael, 326 U. S. 224, 227.

Stark necessity is an impressive and often compelling thing, but unfortunately it has all too often been claimed loosely and without warrant in the law, as elsewhere, to justify that which in truth is unjustifiable. As one of

---

[29] In 1804 the Chief Justice and two Associate Justices of the Pennsylvania Supreme Court were actually impeached for sentencing a person to jail for contempt. In part the impeachment rested on the feeling that punishment of contempt by summary process was an arbitrary practice of the common law unsuited to this country. While the Justices were narrowly acquitted this apparently only aggravated popular antagonism toward the contempt power. See 3 McMaster, History of the People of the United States (1938 ed.), 153–162.

our great lawyers, Edward Livingston, observed in proposing the complete abolition of summary trial of criminal contempts:

> "Not one of the oppressive prerogatives of which the crown has been successively stripped, in England, but was in its day, defended on the plea of necessity. Not one of the attempts to destroy them, but was deemed a hazardous innovation." [30]

When examined in closer detail the argument from "necessity" appears to rest on the assumption that the regular criminal processes, including trial by petit jury and indictment by grand jury, will not result in conviction and punishment of a fair share of those guilty of violating court orders, are unduly slow and cumbersome, and by intervening between the court and punishment for those who disobey its mandate somehow detract from its dignity and prestige. Obviously this argument reflects substantial disrespect for the institution of trial by jury, although this method of trial is—and has been for centuries—an integral and highly esteemed part of our system of criminal justice enshrined in the Constitution itself. Nothing concrete is ever offered to support the innuendo that juries will not convict the same proportion of those guilty of contempt as would judges. Such evidence as is available plus my own experience convinces me that by and large juries are fully as responsible in meting out justice in criminal cases as are the judiciary.[31] At the same time, and immeasurably more important, trial before a jury and in full compliance with all of the other protections of the Bill of Rights is much

---

[30] 1 Works of Edward Livingston 264.

[31] See, *e. g.*, Sunderland, Trial by Jury, 11 Univ. of Cin. L. Rev. 119, 120; Hartshorne, Jury Verdicts: A Study of Their Characteristics and Trends, 35 A. B. A. J. 113.

less likely to result in a miscarriage of justice than summary trial by the same judge who issued the order allegedly violated.

Although some are prone to overlook it, an accused's right to trial by a jury of his fellow citizens when charged with a serious criminal offense is unquestionably one of his most valuable and well-established safeguards in this country.[32] In the words of Chief Justice Cooley: "The law has established this tribunal because it is believed that, from its numbers, the mode of their selection, and the fact that jurors come from all classes of society, they are better calculated to judge of motives, weigh probabilities, and take what may be called a common sense view of a set of circumstances, involving both act and intent, than any single man, however pure, wise and eminent he may be. This is the theory of the law; and as applied to criminal accusations, it is eminently wise, and favorable alike to liberty and to justice." *People* v. *Garbutt,* 17 Mich. 9, 27. Trial by an impartial jury of independent laymen raises another imposing barrier to oppression by government officers. As one of the more perceptive students of our experiment in freedom keenly observed, "The institution of the jury . . . places the real direction of society in the hands of the governed, or of a portion of the governed, and not in that of the government." 1 De Tocqueville, Democracy in America (Reeve trans., 1948 ed.), 282. The jury injects a democratic element into the law. This element is vital to the effective administration of criminal justice,

---

[32] See *Ex parte Milligan,* 4 Wall. 2, 122–123; *Thompson* v. *Utah,* 170 U. S. 343, 349–350; *Dimick* v. *Schiedt,* 293 U. S. 474, 485–486; *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, 16, 18–19; The Federalist, No. 83 (Hamilton) ; 2 Story, Commentaries on the Constitution of the United States, 544; 2 Wilson's Works (Andrews ed. 1896) 222.

not only in safeguarding the rights of the accused, but in encouraging popular acceptance of the laws and the necessary general acquiescence in their application. It can hardly be denied that trial by jury removes a great burden from the shoulders of the judiciary. Martyrdom does not come easily to a man who has been found guilty as charged by twelve of his neighbors and fellow citizens.

It is undoubtedly true that a judge can dispose of charges of criminal contempt faster and cheaper than a jury. But such trifling economies as may result have not generally been thought sufficient reason for abandoning our great constitutional safeguards aimed at protecting freedom and other basic human rights of incalculable value. Cheap, easy convictions were not the primary concern of those who adopted the Constitution and the Bill of Rights. Every procedural safeguard they established purposely made it more difficult for the Government to convict those it accused of crimes. On their scale of values justice occupied at least as high a position as economy. But even setting this dominant consideration to one side, what compelling necessity is there for special dispatch in *punishing* criminal contempts, especially those occurring beyond the courtroom? When the desired action or inaction can no longer be compelled by coercive measures and all that remains is the punishment of past sins there is adequate time to give defendants the full benefit of the ordinary criminal procedures. As a matter of fact any slight delay involved might well discourage a court from resorting to hasty, unnecessary measures to chastise suspected disobedience. I believe that Mr. Justice Holmes, speaking for himself and Mr. Justice Brandeis, took his stand on invulnerable ground when he declared that where "there is no need for immediate action contempts are like any other breach of law and should be dealt with as the law deals with other

illegal acts." *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, 425–426 (dissenting opinion).[33]

For almost a half century the Clayton Act has provided for trial by jury in all cases of criminal contempt where the alleged contempt is also a violation of a federal criminal statute.[34] And since 1931 the Norris-LaGuardia Act has granted the same right where a charge of criminal contempt is based on the alleged violation of an injunction issued in a labor dispute.[35] Notwithstanding the forebodings of calamity and destruction of the judicial system which preceded, accompanied and briefly followed these reforms, there is no indication whatever that trial by jury has impaired the effectiveness or authority of the courts in these important areas of the law. Furthermore it appears that in at least five States one accused of the crime of contempt is entitled, at least to some degree, to demand jury trial where the alleged contempt occurred

---

[33] Again this case aptly demonstrates the point. Here the defendants surrendered several years after they had been ordered to appear and serve their sentences. There was no reason for urgent action to punish them for their absence, there was ample time to impanel a jury and prosecute them in the regular manner. As a matter of fact almost a month and a half did elapse between their surrender and trial.

Alleged contempts committed beyond the court's presence where the judge has no personal knowledge of the material facts are especially suited for trial by jury. A hearing must be held, witnesses must be called, and evidence taken in any event. Cf. *Cooke* v. *United States,* 267 U. S. 517. And often, as in this case, crucial facts are in close dispute.

I might add, at this point, that MR. JUSTICE BRENNAN has forcefully demonstrated, in my judgment, that the evidence in this case was wholly insufficient to prove a crucial element of the offense charged—namely, notice of the surrender order.

[34] 38 Stat. 738–739, as amended, 18 U. S. C. §§ 402, 3691.

[35] 47 Stat. 72, 18 U. S. C. § 3692.

beyond the courtroom.[36]   Again, I am unable to find any evidence, or even an assertion, that judicial orders have been stripped of their efficacy or courts deprived of their requisite dignity by the intervention of the jury in those States.   So far as can be discerned the wheels of justice have not ground to a halt or even noticeably slowed. After all the English courts apparently got on with their business for six or seven centuries without any general power to try charges of criminal contempt summarily.

I am confident that in the long run due respect for the courts and their mandates would be much more likely if they faithfully observed the procedures laid down by our nationally acclaimed charter of liberty, the Bill of Rights.[37]   Respect and obedience in this country are not engendered—and rightly not—by arbitrary and autocratic procedures.   In the end such methods only yield real contempt for the courts and the law.   The classic example of this is the use and abuse of the injunction and summary contempt power in the labor field.   The federal courts have still not recovered from the scars inflicted by their intervention in that area where Congress finally stepped in and preserved the right of jury trial to all those charged with the crime of contempt.

In the last analysis there is no justification in history, in necessity, or most important in the Constitution for trying those charged with violating a court's decree in a manner wholly different from those accused of disobeying any other mandate of the state.   It is significant that neither the Court nor the Government makes any serious effort to justify such differentiation except that it has been sanctioned by prior decisions.   Under the

---

[36] Arizona, Rev. Stat. Ann., 1956, § 12–863; Georgia, Code Ann., 1935, § 24–105; Kentucky, Rev. Stat. Ann., 1955, § 432.260; Oklahoma, Stat. Ann., 1936, Tit. 21, § 567; Pennsylvania, Purdon's Stat. Ann., 1930 (Cum. Ann. Pocket Pt. 1957), Tit. 17, § 2047.

[37] See Brown, Whence Come These Sinews? 12 Wyo. L. J. 22.

Constitution courts are merely one of the coordinate agencies which hold and exercise governmental power. Their decrees are simply another form of sovereign directive aimed at guiding the citizen's activity. I can perceive nothing which places these decrees on any higher or different plane than the laws of Congress or the regulations of the Executive insofar as punishment for their violation is concerned. There is no valid reason why they should be singled out for an extraordinary and essentially arbitrary mode of enforcement. Unfortunately judges and lawyers have told each other the contrary so often that they have come to accept it as the gospel truth. In my judgment trial by the same procedures, constitutional and otherwise, which are extended to criminal defendants in all other instances is also wholly sufficient for the crime of contempt.

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS join, dissenting.

I dissent because I do not believe that the evidence was sufficient to establish beyond a reasonable doubt the petitioners' guilt of the criminal contempt charged.

Petitioners were among 11 leaders of the Communist Party who were convicted of violation of the Smith Act, now 18 U. S. C. § 2385, on October 14, 1949. Both were sentenced to a fine of $10,000 and to five years' imprisonment, and were enlarged on bail pending appeal. The Court of Appeals affirmed the convictions on August 1, 1950, and this Court in turn affirmed on June 4, 1951. *Dennis* v. *United States,* 341 U. S. 494. On June 28, 1951, prior to formal receipt of the Supreme Court judgment, the District Court drew up a proposed Order on Mandate making the judgment of this Court that of the District Court. The last paragraph "FURTHER ORDERED, ADJUDGED and decreed that the defendants personally surrender to the United States Marshal . . . on the 2nd day of July,

1951 . . . ." This proposed order was served on the attorneys for the 11 and they promised to bring their clients into court the following Monday, July 2, to begin serving their sentences. On Friday, June 29, the attorneys met with all the defendants and "advised that they all should be present [in court on Monday] and . . . [were] assured they would be." But by Monday four had absconded. Since seven were present, however, the Order on Mandate was signed, and the seven were taken off to serve their prison terms. The court canceled the bail of the missing four on July 3 and issued a bench warrant for their arrest. Two of the four, Hall and Thompson, were apprehended in 1951 and 1953 respectively and were convicted of criminal contempt. *United States* v. *Hall,* 198 F. 2d 726; *United States* v. *Thompson,* 214 F. 2d 545. The petitioners surrendered voluntarily in 1956 and were likewise convicted of criminal contempt. The contempt charged in each instance was a violation of 18 U. S. C. § 401 (3) by disobedience of the provision of the Order on Mandate, issued on the morning of July 2, 1951, requiring the surrender of all the *Dennis* defendants to the United States Marshal at 11:05 a. m. on that day. Significantly, at the time the judge signed the order he lined out the hour of surrender, appearing as 10:30 in the proposed order, and substituted 11:05, the time at which the order was actually signed. See the opinion of Judge Biggs in *United States* v. *Hall, supra,* at 732.

The most that can be said is that the evidence might have been sufficient to support conviction of the petitioners for bail jumping if that had been an offense at the time they fled. But bail jumping did not become a separate crime until three years after the petitioners' flight, when this void in the law—highlighted by the petitioners' conduct—led the Department of Justice to secure the enactment of 18 U. S. C. § 3146. See H. R. Rep. No. 2104, 83d Cong., 2d Sess. But, in any event, bail jumping is

not the offense charged, and, although it is certainly a most serious obstruction of the administration of justice, it is not in itself a criminal contempt.

The Court relates the criminal contempt charged to bail jumping by its use of § 3146 as support for the sentences imposed upon the petitioners. But bail jumping under § 3146 is proved merely by evidence that the accused willfully failed to surrender within 30 days after incurring a forfeiture of his bail. Much more, however, than evidence sustaining a conviction for bail jumping is necessary to sustain convictions for the contempts here charged of violating 18 U. S. C. § 401 (3) by willful and knowing disobedience of a single provision of the Order on Mandate of July 2, 1951. The indispensable element of that offense, to be proved beyond a reasonable doubt, *Gompers* v. *Bucks Stove & Range Co.*, 221 U. S. 418, 444, is that the petitioners, who were not served with the order, in some other way obtained actual knowledge of its existence and command. *Kelton* v. *United States*, 294 F. 491; *In re Kwelman*, 31 F. Supp. 23; see *Wilson* v. *North Carolina*, 169 U. S. 586.

Assessment of the sufficiency of the evidence bearing on the petitioners' knowledge requires that the precise time at which the order came into existence be kept clearly in mind. The Court of Appeals below fell into palpable error in reading the specifications to charge "disobedience of the order of June 28." 241 F. 2d 631, 632. The order was not signed or entered until court convened after 10 o'clock on the morning of July 2. What happened on June 28 was that the attorneys of the *Dennis* defendants were served with copies of a *proposed* order to be entered on July 2. But the attorneys' knowledge cannot be imputed to their clients. *In re Kwelman, supra.* The petititioners had absconded by July 2, and the record is completely silent as to their whereabouts from June 29 until they surrendered almost five years later. Con-

cededly, direct evidence of knowledge by the petitioners of the order of July 2 is wholly lacking and the case for conviction rests entirely upon circumstantial evidence.

The proof upon which reliance is placed consists of evidence (1) that the petitioners knew on June 29, 1951, that the order was to be entered on July 2, and (2) that the petitioners made certain statements to the press at the time of their surrender almost five years later.

*First.* Manifestly, foreknowledge that an order might come into existence does not prove knowledge that it did come into existence. Even if the petitioners knew on June 29 that the order was likely to be signed on July 2, the most that can be said is that after July 2 the petitioners knew that the order *was to have been entered.* This, of course, is not the same as knowledge that the order *had been entered,* and it is the latter knowledge which the Government must prove beyond a reasonable doubt. Knowledge that the order *had been entered,* of course, could only be acquired by the petitioners after the order had come into existence on the morning of July 2; and that knowledge can hardly be inferred from the events which occurred prior to the moment the order was entered. See the opinion of Judge Biggs in *United States* v. *Hall,* 198 F. 2d 726, 733–735.

The Government's lack of confidence in the proofs to show actual knowledge is implicit in its effort to sustain the convictions on a theory of constructive knowledge derived from the events of June 28 and from the evidence that on June 29 the petitioners and the other *Dennis* defendants were told by the attorneys that they must be in court on July 2. The short answer to this contention is that the petitioners are not charged with disobedience of an order of which they had *constructive* knowledge but with disobedience of an order of which they had *actual* knowledge, and conviction can be had on the precise charge, or not at all. In any event, the sole authority

relied upon by the Government is a dictum in *Pettibone v. United States,* 148 U. S. 197, 206–207, to the effect that persons may be chargeable with knowledge of an order from notice that an application will be made for the order. But whatever its utility in civil cases, theories of constructive knowledge have no place in the criminal law. Not only is this forcefully demonstrated in Judge Biggs' opinion in *United States* v. *Hall, supra,* but the *Pettibone* dictum has not been followed in criminal contempt cases. *Kelton* v. *United States, supra; In re Kwelman, supra.*

*Second.* Since the evidence of knowledge that an order was to be entered is not sufficient to prove knowledge that the order was entered, what of the evidence of what was said by the petitioners at the time of their surrender? The Court refers to the petitioners' press releases in which they stated they would surrender to "enter prison," and to Green's further reference that he intended to "go to the United States Marshal's Office." But, of course, surrender could only have been to enter prison. Their statements prove no more than what the petitioners and everyone else knew had to happen when this Court affirmed their Smith Act convictions in 1951. And it can hardly be doubted that, after the many months these petitioners spent at their trial in the Foley Square Courthouse, both the location and function of the Marshal's Office was well known to them. That the Court must resort to these statements to find probative weight in the evidence demonstrates the inherent insufficiency of the proofs to show actual knowledge.

Nor do there appear other circumstances from which knowledge may be inferred. The Court's opinion gives the impression that the surrender order was an order in familiar and customary use, well known to the sophisticated in the criminal law. I doubt that even widely experienced criminal lawyers encounter this provision very often. The provision was not the occasion for the

entry of the order of July 2. The purpose of that order, as its caption "Order on Mandate" shows, was to enter an order in the District Court to give effect to the Mandate of this Court affirming the convictions of the *Dennis* defendants. But for the necessity of entering an order for that purpose there may well have been no surrender order. No statute or rule of court, even a local rule of the District Court, can be pointed to as requiring inclusion of the surrender provision. The bondsman who stands to lose the posted bail, not a surrender order, is usually counted on to produce the defendant. Hearings before Subcommittee No. 4 of the House Committee on the Judiciary on H. R. 8658, 83d Cong., 2d Sess. 14–19. This is not to say, of course, that the provision was in any way improper or illegal or served no useful purpose. Nevertheless its novelty is indicated when the Court must look to a provision of the bail bond as the only discoverable source of authority for the provision.

I can well understand why the Government should have desired to proceed against these petitioners for their serious obstruction of the administration of justice. In the absence of a statutory provision aimed directly at this conduct, the Government resorted to this attempt to punish that obstruction as a criminal contempt. However, regardless of the view taken on the underlying constitutional issue involved, the odiousness of the offense cannot be a reason for relaxing the normal standards of proof required to sustain a conviction under § 401 (3). Believing that the proofs in this case fall short of that standard, I must dissent.