See, also, 227 F.2d 848.

**Oleta O'Connor YATES, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 13541.**

United States Court of Appeals Ninth Circuit.

July 26, 1955.

Rehearing Denied Nov. 2, 1955.

Writ of Certiorari Granted Jan. 16, 1956.

See 76 S.Ct. 322.

---

852

Margolis, McTernan & Branton, Los Angeles, Cal., for appellants.

Gladstein, Andersen & Leonard, San Francisco, Cal., Robert W. Kenny, Daniel Marshall, Los Angeles, Cal., amici curiæ.

Laughlin E. Waters, U. S. Atty., Norman W. Neukom, Los Angeles, Cal., Lawrence K. Bailey, Washington, D. C., Ray H. Kinnison, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before STEPHENS, FEE and CHAMBERS, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

On July 8, 1952, an order, judgment and certificate of criminal contempt was entered as to Oleta O'Connor Yates upon eleven specifications of refusal to respond to questions put to her on cross-examination after a direction by the court while she was a witness in the trial of the case entitled on the records of that court United States v. Schneiderman, No. 22,131–C.D, D.C., 106 F.Supp. 941. This certificate recited these refusals "were committed in the actual presence of the Court and were seen or heard by the Court."

After the sentence of five years in the principal case was imposed upon Mrs. Yates on August 7, 1952, in the main case in which she was a defendant, Yates v. United States, 9 Cir., 225 F.2d 146, she was in custody thereunder, together with the other convicted defendants. The court held a hearing on August 8, 1952, at which she was present, personally, and was represented by counsel. Based upon the "order, judgment and certificate of criminal contempt" of July 8 under 18 U.S.C.A. § 401, hereinabove referred to, the court adjudged Mrs. Yates had been convicted of eleven separate criminal contempts therein set out. The defendant was thereupon committed to the custody of the Attorney General of the United States for one year for each of such contempts. These sentences were made to run concurrently with each other, but all were made to take effect upon the release of defendant from custody following execution of the five year sentence of imprisonment imposed August 7, 1952, upon this defendant in Case No. 22,131, United States v. Schneiderman.

Appeal was taken from this judgment of criminal contempt on August 13, 1952.

The proceedings of the court were fair and in accordance with the precedents. There was due process at every stage. When the matter came on for hearing the day after sentence in the main case, the court had power to impose

appropriate sentence for the contempts specified in the order of July 8.

There was a lapse of time between the commission of the disobedience of the order in open court and the entry of the judgment establishing each refusal as a criminal contempt on July 8 and the entry of sentence on each of the contempts on August 8. It is now well established practice for the trial judge to reserve punishment of contempts by participants in a criminal trial. The dangers surrounding such procedure are not legal in nature, but arise in policy. None was apparent here.

■ A point was made in the trial court that, since defendant was in custody after June 26, when she was committed, until she had given answer to four questions which were propounded to her upon that date, the time so spent should have been applied in mitigation of this punitive sentence. But that measure applied only to the four questions, as noted above, propounded on that date. These eleven questions, each of which was propounded upon June 30, constitute incidents separate and distinct from the first four. Furthermore, verdicts of guilty were returned in the main case against Mrs. Yates and the other defendants on August 6, and she was held in jail on that charge pending sentence. The custody on the first contempt charge ended with the discharge of the jury. Neither the coercive custody on the first contempt charge nor yet confinement after verdict upon the main charge was relevant to the criminal sentences here.

■ The main contention of defendant is that, when this punitive sentence was imposed, it was no longer possible for defendant to purge herself because the trial had ended and that it is improper for the court to use criminal contempt as a coercive rather than a punitive proceeding.

While it is true the court did speak of his disposition to release the defendant from the adjudication of contempt on these specifications in the event she bowed to the authority of the court, this was a suggestion of grace. It must be clearly recognized that it was no longer possible for the situation to be restored so that she could testify. In another proceeding as to other contempts, the trial judge indicated his opinion that he had power to imprison defendant until the questions there were answered. In this proceeding, there was no attempt at coercion to require the answers.

The persistent and recalcitrant refusal to bow to the authority of the august tribunal, even when offered grace after the trial was over, is highly illuminating.

The next contention of defendant takes color therefrom. Defendant, notwithstanding her defiance of the orders of the court and her refusal of grace, insists that the sentence of one year is excessive and arbitrary, constitutes cruel and unusual punishment and is a denial of due process of law in violation of the Eighth and Fifth Amendments to the federal Constitution.

The defendant had been committed for coercive purposes on June 26 to compel her answers to certain questions. Four days later, while still in custody and still under cross-examination, she committed the contempts certified in this case by refusal to answer other questions. The trial judge found from her own statement in open court on the day of sentence that "she is as adamant now as she was the day the questions were put."

The processes of justice require that all witnesses in a criminal case should obey the legal orders of the court. These processes cannot function without evidence adduced by legitimate questions and answers thereto.

■ In our system, there is an impregnable bastion erected to protect a defendant not only against self incrimination, but even against a compulsion to testify. As long as a defendant remains within the barbican of this guarantee, protection is absolute. The prosecutor cannot comment on this silence.

All the defendants in this case except Mrs. Yates accepted this protection. She

voluntarily waived it. She knew the rule. She knew if she testified in order to attempt to clear herself and the other defendants, that she would be asked if they belonged to the Communist Party.

The various suggestions now made that the questions were not material, that the failure to answer did no harm, that she and the other defendants were convicted in any event are creations of straw. Technically, the questions were proper and material.

Her own alleged reasons are of no more validity. She said:

"Well, I am quite prepared to discuss anything that I did, anything that I said, but I am not willing to provide names and identities of people other than those that I have indicated, because I believe that in the case of the other defendants their case is already rested and I would only be contributing toward adding to the prosecution case against them, and I think that that would be becoming a government informer and I cannot do that.

\* \* \* \* \*

"The Court: You are instructed, Madam, to answer that question.

"The Witness: I understand, your Honor. And for the reasons I have given, because I just will not be an informer, I will not play the role of a witness for the Government, and I will not add to the prosecution's case against people who have rested, who are defendants and who are putting on no further defense. I am sorry, your Honor, I cannot answer that question.

"The Court: You understand the possible consequences of your refusal to answer, I take it?

"The Witness: I am afraid I do, but the possible consequences, grim as they may be, are not as bad as going around hanging your head in shame for the rest of your life, because you will not be an informer.

\* \* \* \* \*

"The Witness: Well that is a question which, if I were to answer, could only lead to a situation in which a person could be caused to suffer the loss of his job, his income and perhaps be subjected to further harassment, and in a period of this character, where there is so much witch-hunting, so much hysteria, so much anti-communism, I am sorry I cannot bring myself to contribute to that.

\* \* \* \* \*

"However many times I am asked and in however many forms, to identify a person as a communist, I can't bring myself to do it, because I know it means loss of job, I know that it means persecution for them and their families, I know that it even opens them up to possible illegal violence, and I will not be responsible for that. I will not do it.

\* \* \* \* \*

"As I stated this morning, I would again be putting myself in the role of a government informer if I were to start discussing any of the questions that pertain to defendants who have rested their case, and do not propose to put on any further defense, and for that reason I refuse to answer.

\* \* \* \* \*

"A. No. I am sorry I can't for the same reasons that I advanced last week. I feel that these people are in a position where my identification of them as Communists would do them an inestimable amount of damage. I am willing to give names of people whom I know I cannot hurt, but where it is a question of damaging their interests, of harming their ability to make a livelihood, of hurting their families, No.

"Q. People that are employed by the Communist Party would not be discharged, would they, by having their names revealed? A. People who may be employed by the Communist Party would not be discharg-

ed by having their names revealed, but members of their families can suffer the results of it in many different ways.

\* \* \* \* \*

"Well, that, again, comes into the same category. I can be asked 500 names, and if my identification of these people who are living people who can be hurt by my public identification of them, as they can be, then I cannot answer it. I am willing to name people who may have died, whose families cannot be \* \* \*."

 It must be remembered she was being asked about persons with whom she was charged as a co-conspirator in agreement to teach and advocate the overthrow and destruction of the government of the United States by force and violence as speedily as circumstances would permit. A defendant who chooses to take the stand cannot pick and choose the questions to which he will give answer. A person accused of murder jointly with another who is alleged to have actually done the killing cannot refuse to answer as to association or acts of the latter on the ground that he would hang his head in shame if he testified for the government against a person he thought unjustly accused. The guarantee against being required to testify would be turned into a sword instead of a shield.

The court had a right to take into consideration the defiant and recalcitrant attitude of defendant in assessing the penalty. A defendant in an ordinary criminal case who attempted so to protect his confederates would be dealt with severely, and necessarily so. It is far from our thought that a trial court cannot maintain its essential authority where the deliberate defiance arises from loyalty to political confederates or the religion of communistic determinism.

The sentence was severe. Its control is not in our province. It cer-

tainly indicates no abuse of discretion. It is true the vindication of the authority of the court would have been better subserved by an immediate commitment rather than confinement after release on the sentence in the main case. This Court has no power to control the discretion of the trial judge in this respect either.[1]

Affirmed.

1. United States v. Bollenbach, 2 Cir., 125 F.2d 458, 459.