John Shields DASCHBACH, Appellant,

v.

UNITED STATES of America,
Appellee.

Terry PETTUS, Appellant,

v.

UNITED STATES of America,
Appellee.

Herbert J. PHILLIPS, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 14321–14323.

United States Court of Appeals
Ninth Circuit.

April 21, 1958.

John Caughlan, Seattle, Wash., for appellants Daschbach and Pettus.

Philip L. Burton, Seattle, Wash., for appellant Phillips.

Charles P. Moriarty, U. S. Atty., Richard D. Harris, Asst. U. S. Atty., Seattle, Wash., Kevin T. Moroney, William F. O'Donnell, III, John J. Keating, Jr., Attorneys, Department of Justice, Washington, D. C., for appellee.

Before HASTIE, CHAMBERS, and HAMLEY, Circuit Judges.

HAMLEY, Circuit Judge.

These criminal contempt proceedings are an outgrowth of United States v. Huff, a Smith Act, 18 U.S.C.A. § 2385, case in which judgments of conviction were recently reversed.[1]

John Shields Daschbach and Terry Pettus, defendants in the principal case,

1. Fujimoto v. United States (Huff v. United States), 9 Cir., 251 F.2d 342.

took the witness stand, but refused to answer certain questions on cross-examination. Herbert J. Phillips was called as a witness for the defendants in the principal action. He likewise refused to answer certain questions on cross-examination.

In each instance, the trial judge held the witness to be in contempt as soon as the refusal occurred. Each was then immediately remanded to the custody of the marshal until the end of the Smith Act trial. At the close of the trial, all three were adjudged guilty of criminal contempt. In each case, a penitentiary sentence of three years was imposed.

Each has appealed. Daschbach and Pettus filed joint briefs. We consolidated the three appeals for purposes of argument and disposition.

 Several questions are presented on appeal. The first of these is whether, by imprisoning appellants during the course of the trial, the court exhausted its summary power and was without jurisdiction to impose the further sentences which gave rise to this appeal.

Determination of this question requires us to consider some additional facts. The Huff Smith Act trial commenced on April 15, 1953, and ended on October 10, 1953. On July 21, 1953, while under cross-examination as a witness for the defendants, Phillips was asked to name the chairman of the club to which he then belonged.[2] Phillips refused to answer the question. He did so because of the hardship he believed it would cause persons who had not previously been publicly associated with the Communist Party. The witness did not invoke the Fifth Amendment.

The trial court directed Phillips to answer the question, but he still refused. The court then announced: "The court finds the witness in contempt of court and the record will so show." After the jury had been excused for the noon recess, the court placed Phillips under the custody of the marshal "until he purges himself from contempt." [3]

Phillips did not thereafter offer to answer the question which had led to his commitment. He therefore remained in the custody of the marshal until the case went to the jury on October 9, 1953—a total of eighty days.

Appellant Pettus, a defendant in the Smith Act case, took the witness stand in his own defense. On August 14, 1953, while under cross-examination, he was asked to name those who had been elected to the executive committee of the Northwest District of the Communist Party at the convention held in 1950. Pettus partially answered the question by giving the names of Huff, Bowen, and Van Lydegraf.

He declined, however, to name any other persons who had been elected to this committee. His reason, as in the case of Phillips, was that he deemed it dishonorable to involve persons other than codefendants or others whose status had already been dealt with publicly. The Fifth Amendment was not invoked.

Upon the suggestion of the court, the question was not pursued to conclusion on that day, but was renewed on the next day of the trial—August 18, 1953. Pettus still refused to give a complete answer to the question, though directed by the trial court to do so. The court then said: "The court finds the witness and the defendant in contempt of court."

2. Counsel for defendants objected to the question, arguing that the question went beyond the scope of the direct examination; was irrelevant and not probative of any issue in the trial; would, if answered, be a hardship on the person named; and called for hearsay evidence. Substantially the same objections were voiced concerning the below-noted questions later asked of Pettus and Dasch-

bach. All such objections were overruled.

3. Phillips and counsel for the defendants in the Smith Act trial were given full opportunity to confer as desired. The same arrangement was later made with regard to Pettus and Daschbach when they were committed during the course of the trial.

At the end of the day, and after the jury had been excused, the court committed Pettus to the custody of the marshal "until he purges himself of contempt." Pettus did not thereafter offer to answer the question which had led to his commitment. He therefore remained in the custody of the marshal until the case went to the jury on October 9, 1953 —a total of fifty-two days.

Appellant Daschbach, a defendant in the Smith Act case, took the witness stand in his own defense. On September 10, 1953, while under cross-examination, he was asked to name the members of the District Committee of the Communist Party while he was on the "review commission." Daschbach named Huff, Bowen and Pettus, as members of this committee. He declined, for the same reasons given by Phillips and Pettus, to name any other members of the committee. Again the Fifth Amendment was not invoked.

The court thereupon directed Daschbach to answer the question. He refused. The court then said: "It is the court's finding at this time that the witness, the defendant Mr. John Daschbach, is in contempt of court." After the jury had been excused for the day, Daschbach was remanded to the custody of the marshal.

Seven days later, while Daschbach was still under cross-examination, he was asked what two persons, in addition to himself, were on the "review commission, Northwest District." Daschbach declined to answer, though directed by the court to do so. Later in the morning of that day, in the absence of the jury, the court stated: " * * * The court finds the defendant and witness, Mr. Daschbach, in contempt for refusing to answer the question. * * * " Since Daschbach had previously been remanded to the custody of the marshal, no further commitment was entered at that time.

Daschbach did not, after his commitment on September 10, 1953, offer to answer either of the questions which led to the contempt adjudications referred to above. He therefore remained in the custody of the marshal until the case went to the jury on October 9, 1953—a total of twenty-nine days.

On October 9, 1953, immediately after the jury had retired to consider its verdict, counsel for defendants moved that Phillips, Pettus, and Daschbach be released from custody. The court indicated that it would grant this motion, but that it would, at the same time, file specifications of criminal contempt against each of them. The court thereupon called forward, one at a time, Phillips, Pettus, and Daschbach, and advised each of them that a certificate of contempt conforming with Rule 42(a), Federal Rules of Criminal Procedure, 18 U.S.C.A., was being filed.

Each such certificate sets out, verbatim, the portion of the trial proceedings during which the contempt occurred. Each also states that the person named has been convicted and adjudged guilty of contempt (two convictions in the case of Daschbach), in violation of 18 U.S. C.A. § 401, committed in the presence of the court, "by wilful disobedience of the order of the Court * * *."

Imposition of sentence in each case was continued for a week. Each was ordered released from the order of contempt entered during the trial, and was authorized to be released from custody under the conviction for criminal contempt upon the posting of bail.

Sentences of three years imprisonment were imposed upon each appellant on October 16, 1953. In the case of Pettus and Daschbach, these sentences were made to run consecutively to, and begin with the expiration of, the sentences imposed against them in the Smith Act case.[4]

4. Five-year sentences had been imposed on Pettus and Daschbach following their conviction of conspiracy to violate the Smith Act. As before stated, these judgments of conviction have been reversed.

We now return to the first question presented on this appeal—whether, by imprisoning appellants during the course of the trial, the court exhausted its summary power, and was without jurisdiction to impose the further sentences which gave rise to this appeal.

The facts stated above show that the restraint imposed upon appellants during the course of the trial was intended to be coercive and not punitive. In Yates v. United States, 9 Cir., 227 F.2d 848, 850–851,[5] it was held, under circumstances similar to those which existed in the case now before us:

"* .* * The peculiar nature of proceedings for contempt permits temporary coercive measures followed by imprisonment for a fixed term as punishment. * * *

"In any event, the intellectual confusion noted prevents us from denominating the two periods of custody under two different judgments for the same four refusals as double jeopardy for the same acts. * *"

We therefore hold that, in the instant case, the trial court had not exhausted its power to invoke penal sanctions at the close of the trial.

The Yates opinion to which reference has been made, however, contains this further statement:

"* * * But, while coercion is applied, the defendant in the criminal case is entitled to know he may yet be subjected to a definite penalty for contempt and that the coercive restraint is not intended to relieve him of the punishment for the criminal refusals which he has already uttered.

"* * * If then the record had shown a definite notification to defendant at an appropriate time, the coercive and punitive sanctions might have been successively applied. But the concept of due process of law is an additional safeguard. The notions inherent therein will not permit, without prior positive notification, what otherwise might be viewed as the indefinite confinement of a defendant in a criminal case pending his submission as a witness to authority, and then, when imprisonment has had no effect, the punishment of the refusal of obedience by incarceration for a term of years." (227 F.2d at pages 850–851) [6]

■ It is our opinion that the circumstances present in that Yates case and in the instant case are of such similarity that the due process consideration referred to in the Yates case is equally present here. It is true that the quoted language of the Yates opinion refers to the susceptibility of a "defendant in the criminal case," to an adjudication of criminal contempt following coercive restraint. The rationale of that opinion, however, would apply equally to one who, like appellant Phillips, was a witness but not a defendant.

We likewise believe that no distinction can be drawn between this Yates case and the case before us on the ground that here the appellants had more definite notice than did the witness in Yates, that the immediate restraint was intended to last only until the end of the trial. As before indicated, Phillips and Pettus (but not Daschbach) were specifically advised at the time of their initial restraint that such restraint was to continue "until he purges himself of contempt." They were not then told that such coercive restraint would terminate at the end of the trial. This is similar to what Mrs. Yates was told at the time of her commitment during that Smith Act trial. The trial court in that case

5. This Yates case was decided on July 26, 1955, which was after the briefs were filed in the instant case. There were two other Yates contempt cases in this court (227 F.2d 844; 227 F.2d 851, reversed 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95), and a Yates Smith Act case, 9 Cir., 225 F.2d 146, reversed 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356.

6. On this ground, the judgment of conviction in that case was reversed.

told Mrs. Yates that she was being committed to the custody of the marshal "until you have purged yourself of your contempt by answering the questions ordered to be answered in each instance or until further order of the court."

Were each of the appellants now before us given the "prior positive notification" that a punitive sanction might be applied, which was held, in the above Yates case, to be a requirement of due process? This question was not expressly raised in the briefs or oral arguments. In our opinion, however, it is a due process question which inheres in the above-stated argument advanced by appellants. It must therefore be dealt with at this time.

Shortly before ordering Daschbach into custody during the course of the trial, the trial court remarked:

"The Court—you [Daschbach] realize, of course, as I assume you do from a similar action, understand the result [of declining to answer]?"

This is the only remark touching the prospect of a future penalty made by the court at or about the time Daschbach was remanded to the custody of the marshal during the course of the trial.

The quoted remark falls short of the prior positive notification of a possible criminal penalty which is a procedural condition precedent to the imposition of such a penalty.

The remarks made by the trial court on or about the time Pettus was ordered into custody during the course of the trial are quoted in the margin.[7] Of these seven different remarks, it will be seen that all but the first and third speak expressly of coercive restraint, and nothing more. The first quoted remark is more general, referring to "the possible result" of refusing to follow the court's direction. The third quoted remark is the only one which even hints at an additional criminal penalty. But even here there is no suggestion that both coercive measures and a criminal penalty might be imposed.

We conclude that Pettus was not given prior positive notification that a criminal penalty might be imposed in addition to his coercive restraint during the progress of the trial.

The remarks made by the trial court on or about the time Phillips was ordered into custody during the course of the trial, are quoted in the margin.[8] It will

7. " * * * but I do ask the defendant to carefully consider the possible result of refusing to follow the Court's direction."

"The fact that ensuing actions resulting from contempt may serve to place burdens upon the defense does not result from any new interpretation of the law, any unusual interpretation of the law, or on the action of the Court itself which has not been brought about by the defendant."

"The Court takes no pleasure in imposing any punishment or any coercive measures on any witness or defendant. They come to the Court knowing full well what the possible or probable result may be."

" * * * And though coercive action by the Court may not produce any result, it is only brought about because of the adamant position of the persons involved, a position which they insist is sound; and I think that there is no foundation for their position in law, and,

therefore, I am not going to do other than I have already indicated, which I conceive to be my duty."

" * * * and if he sees fit not to answer the question, the Court will find him in contempt of Court and remand him to the custody of the Marshal until he purges himself of contempt as to that question."

" * * * the Court feels that the witness and the defendant being in contempt of Court it is advisable and proper for the Court to commit the defendant to the custody of the Marshal until he purges himself of contempt."

"So that at this time, Mr. Pettus, the Court having found you in contempt, the Court feels it is compelled, as indicated this morning, to now remand you to the custody of the Marshal until you purge yourself of contempt."

8. "The Court must follow those rules and must make rulings, and witnesses in any orderly system must abide by the Court's rulings or, if he chooses not to, he must

be noted that the thought emphasized in most of them was that the court was then only concerned with coercive measures. In the last two remarks, the court drew a clear distinction between the action it was taking and that taken in another case where there was a criminal contempt conviction at the close of the trial, but no coercive restraint. Phillips might reasonably infer from these remarks that he faced one or the other of these courses of action, but not both.

In two of the ten remarks quoted below, there is a hint of possible future punishment in addition to the coercive restraint imposed during the trial. Thus, the court said that "what punishment there may be in addition thereto is another matter and the Court doesn't indicate that there will or will not be any, but that is not in issue at this time." Later, the court said: "The question of punishment for violating any order of the Court has not been considered."

The import of these remarks seems to be that the restraint imposed during trial was intended to be coercive and not penal, and that the court had not yet considered whether an additional penal sentence could and should be imposed. They do not constitute a forthright "positive notification" to Phillips that he was subject to an additional punitive sanction if the court chose to invoke it.

Applying the rule announced in the Yates case, we hold that, at or about the time coercive restraint was applied, none of the appellants was given the required notice that he might yet be subjected to a definite penalty for criminal contempt, and that the coercive restraint was not intended to relieve him of a possible penal sentence. In the absence of such a notice, the subsequent convictions and sentences pursuant to 18 U.S.C.A. § 401, and Rule 42, Federal Rules of Criminal Procedure, 18 U.S.C.A., deprived appellants of due process of law.

abide by the consequences that follow thereupon. * * *"

"The witness will be placed in the custody of the Marshal upon recess until he purges himself from contempt. * *"

"Well, as long as the question remains as put by the Government, and unless it is withdrawn, the Court does not believe that the witness has purged himself of contempt. There is more involved probably than just the answering of the question. It involves the witness determining for himself whether or not he should answer the question, so it is not solely, at this point solely a question of whether the answer is material. Therefore, the Court will not, does not find that the witness has by virtue of compliance or by virtue of subsequent evidence purged himself of contempt, and the Court continues the order heretofore entered and remands the witness to the custody of the Marshal for imprisonment until he purges himself of contempt. * * *"

"The Court has taken no action whatsoever to punish the witness."

"The Court is just using the regular power of the Court to force the witness to testify and it is just as simple for him to purge himself as it is to say the matter is immaterial. * * *"

"* * * He has refused or defied the Court's ruling and so long as he sees fit to do so the Court, of course, can only exercise its powers in that respect during the course of the trial or litigation. What punishment there may be in addition thereto is another matter and the Court doesn't indicate that there will or will not be any, but that is not in issue at this time."

"This isn't criminal contempt."

"* * * the present status here is not criminal contempt. The Court is exercising its power to coerce which is in the nature, as I understand a civil contempt and that is as far as we proceed. The question of punishment for violating any order of the Court has not been considered."

"[Referring to another case] The Court didn't in that case even put the witnesses in custody. The Court didn't exercise its coercive, reparable powers to coerce information there because those men had no control over their position. They were acting under orders. That is immaterial. The Court didn't use its powers there and at the conclusion of the case then cited them for criminal contempt and imposed sentence. * * *"

"I indicated at noon in the Jarvinen case, of course, that the action taken there was not in any way similar. It was a citation under the rules for criminal contempt and was not the exercise of the same power now exercised by the Court, and the Court believes under those circumstances the situation is quite different."

It is unnecessary to consider the other arguments advanced by appellants.

The judgments are reversed.

CHAMBERS, Circuit Judge (concurring).

In the Yates contempt case, 227 F.2d 848, the record shows the trial court when it (during the course of trial) applied a coercive sanction: immediate commitment to jail, was not proceeding under Rule 42(a) of the Rules of Criminal Procedure for a criminal contempt. But the trial judge when first confining Mrs. Yates to jail assured her, "You carry the key to the jail in your purse." Thus, there was an affirmative statement from which one would naturally imply that the contemporaneous action was all there was to it.

Here the facts are about as strong for these defendants as they were for Mrs. Yates. So I concur.

Rule 42(a) does not ordinarily contemplate a trial, but I also assume that before the matter leaves the trial court there would always be the opportunity to raise the point that in imposing the civil sanction the court did not before the close of the testimony advise the defendant he had not exculpated himself under Rule 42(a). Notice to the defendant of possible criminal contempt is required under Yates, supra, if the civil sanction is being applied.

After the law in this circuit was settled by Yates in 1955 on notice, I would require the defendant to make the point in district court on lack of notice. It is clear that both civil and criminal sanctions do not violate the double jeopardy rule of the Fifth Amendment, but even double jeopardy may be waived by neglect to timely assert it. So it may be that with the law settled, as it was not when these defendants were in contempt in 1953, a failure to assert in district court the claim of "no advance notice" should be held a waiver and a valid one.

Also, with the law settled I would think that we should not again accept the point of "no advance notice" as a ground of error unless a positive specification is made. Here the point is made only obliquely.

As I understand it my associates do not reach here the propositions I suggest as a caveat. Dictum is a dangerous thing. However, I believe at the end of the year more decent justice is done if we all adhere strictly to the rules. Therefor, I now try to make it clear that I relax here on the rules on appeal and error because the rule announced in 1955 in Yates was not available to the trial court, the government or the defendants in 1953.