**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John MONTELEONE,
Defendant-Appellant.**

**No. 86–1307.**

United States Court of Appeals,
Seventh Circuit.

Argued June 10, 1986.

Decided Nov. 3, 1986.

Rehearing and Rehearing En Banc
Denied Nov. 18, 1986.

---

Louis Carbonaro, Carbonaro & Carbonaro, Chicago, Ill., for defendant-appellant.

John A. Franke, Organized Crime & Racketeering Sec., Milwaukee, Wis., for plaintiff-appellee.

Before WOOD, CUDAHY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

In August and again in November of 1983 John Monteleone refused to answer questions put to him before a federal grand jury in Milwaukee, Wisconsin. Since his second refusal followed a judicial grant of immunity, he was held in civil contempt and lived out the life of the grand jury in jail. He was later convicted of criminal contempt based on the same refusal to testify, and now appeals that conviction. His principal argument in this court is that he should have been warned during the immunity and civil contempt proceedings that he could face additional prison time under a criminal conviction based on the same conduct. We find that no such warning is required, and for the reasons set forth below we affirm his conviction.

I.

In August of 1977 a bomb was discovered in an automobile in Milwaukee. On November 13, 1979 John Monteleone appeared before a federal grand jury investigating the attempted bombing and refused to answer questions, asserting his Fifth Amendment privilege against self-incrimination. The government did not pursue his testimony further at that time.

Monteleone was again called before a federal grand jury in 1983. This grand jury was investigating possible obstruction of justice charges in connection with Monteleone's 1979 refusal to testify on the attempted bombing. When Monteleone first appeared on August 2, 1983 he refused to testify, again asserting his Fifth Amendment privilege. The government filed a petition under 18 U.S.C. § 6002 requesting that he be immunized from prosecution. At a hearing on October 5, District Judge Terence T. Evans granted the petition and ordered Monteleone to testify, advising him in open court that further refusal could result in his being "held in contempt." He also stated that the government could ask him to "find [Monteleone] in contempt and punish him accordingly." No explicit reference to civil or criminal contempt was made.

Monteleone next appeared before the grand jury on November 1, 1983. He read a brief statement indicating that he had refused to testify in 1979 solely on the advice of his attorney, but refused to answer any questions despite acknowledging that he had been immunized by Judge Evans. The government immediately asked that Monteleone be held in civil contempt and incarcerated under 28 U.S.C. § 1826. At a hearing that same day Judge Evans ruled that Monteleone's prepared statement did not comply with his obligation to testify, held him in contempt and sent him to jail, informing him that he could "purge himself of contempt at such time as he convinces me that he is willing to appear before the grand jury and answer questions as asked."

On January 17, 1984 the government brought Monteleone once more to the grand jury room. The prosecutor reminded him that he had already been held in civil contempt and noted that his refusal to testify "[could] also be considered a crime as well as a civil matter." Monteleone again declined to answer any questions. Three days later the grand jury's term expired and Monteleone was released. He had served two months and three weeks on his civil contempt citation.

On March 28, 1985 the government applied under Rule 42(b), Fed.R.Crim.P., for issuance of a notice of prosecution for criminal contempt against Monteleone based on his refusals to testify in November of 1983 and January of 1984. Notice was entered in the district court by Judge Thomas J. Curran. The case was tried to a jury on a record consisting largely of transcripts of Monteleone's appearances before the grand jury and before Judge Evans. The jury found Monteleone guilty, and Judge Curran sentenced him to a term of four years' imprisonment.

II.

A.

■ Presenting a question of first impression in this Circuit, Monteleone asserts

that his due process rights were violated by Judge Evans' failure to advise him during the civil contempt proceedings that his recalcitrance could also result in separate and additional criminal penalties. He argues that a witness is unlikely to make the distinction between the coercive nature of civil contempt and the "penalty" of criminal contempt, and that without a specific warning a witness in his position is led to believe that the civil sanction is the full penalty for his refusal to testify.[1]

In his briefs in this court Monteleone refers to Judge Evans' failure to warn him "at the time the court imposed the coercive sanction of civil committment for the life of the grand jury ..." The government correctly points out that at the time Monteleone was actually held in civil contempt (November 1, 1983) he had already committed the criminal act of refusing to testify despite immunity; a "warning" delivered at that point would be ineffective because it was then beyond Monteleone's power to erase his criminal conduct by agreeing to testify. *See United States v. Petito*, 671 F.2d 68 (2d Cir.), *cert. denied*, 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982)[2]. At oral argument, Monteleone's counsel suggested that the warning be required at the time immunity is granted, at which point a witness can still heed it and avoid a criminal violation.[3]

In support of his argument Monteleone cites two cases from the Ninth Circuit: *Daschbach v. United States*, 254 F.2d 687 (9th Cir.1958), and *Yates v. United States*, 227 F.2d 848 (9th Cir.1955). In *Yates*, a criminal defendant's refusal to answer four questions on the witness stand at her own trial was met with immediate incarceration "until she should purge herself of the contempt by answering these four questions." 227 F.2d at 849. After her trial ended she was criminally committed for contempt based on the same refusal. The *Yates* court reversed her criminal conviction, holding that she was entitled "at an appropriate time"[4] to be advised that the initial, coercive restraint of civil contempt would not relieve her of liability for criminal contempt. *Id.* at 850–851.

Like *Yates*, *Daschbach* concerned witnesses at criminal trials who refused to answer particular questions. Each of the three witnesses concerned was held in civil contempt and incarcerated for the remainder of the trial, whereupon they were

---

1. Monteleone contends that he was led to believe that the civil sanction was the only one that would be visited upon him, but has not actually claimed that he would have changed his mind about testifying if he had been told further sanctions could follow.

2. In our view there is no requirement that preindictment notice need be given an individual, held in civil contempt for his refusal to testify following a grant of immunity, that he could also be subject to a charge for criminal contempt. Appellant had committed the act subjecting him to criminal contempt at the moment he refused to answer questions after being granted immunity. Any remarks later made by [the district judge], when Petito appeared before him for the second time, were after the fact of the contemptuous act. Appellant had already chosen to disregard the law and risk the consequences. To suggest that he is entitled to notice of those consequences or of the crime he had already committed as a prerequisite to being prosecuted is tantamount to adopting the doctrine ... that ignorance of the law is an excuse.
671 F.2d at 73 (citations omitted).

3. We would not ordinarily consider an *issue* raised for the first time at oral argument. *See, e.g., Goldblatt Brothers v. Home Indemnity Co.*, 773 F.2d 121, 126 (7th Cir.1985). In this case, though, it is more accurate to say that appellant clarified his "warning" argument when he suggested that the warning be given at an efficacious time. Accordingly we deem the point to have been raised sufficiently.

4. The court did not discuss the timing of the notification it required. Of course, as there was no question of immunity (Ms. Yates having waived her Fifth Amendment rights by taking the stand) her conduct must have become contemptuous at the point at which she with certainty "refused" to answer despite being instructed to do so. On some initial refusal a warning would still have been effective if we assume that she could at that point have reconsidered and answered. This seems to us the only logical way to read *Yates;* that court would not have required a warning when it was too late. *But see Petito*, 671 F.2d at 72 (citing *Yates* as requiring "positive notification of a possible criminal contempt charge at the time civil contempt sanctions are imposed").

found to be in criminal contempt and sentenced to three years apiece. The Ninth Circuit adhered to the rule it laid down in *Yates* and reversed the criminal contempt convictions.

As the *Petito* court observed, 671 F.2d at 72 n. 4, *Daschbach* does much to amplify the *Yates* court's concern about confusion and the explicit nature of the notice needed to cure it. The *Daschbach* court reviewed the remarks made by the trial court at the time it held the various witnesses in civil contempt. The trial court at several points drew a distinction between coercive and punitive sanctions and emphasized that coercive measures were the court's only concern at that time. Nevertheless the appellate panel held that the witnesses had not received "positive notification" of the possibility of definite criminal penalties as required by *Yates*,[5] and therefore that their criminal contempt convictions violated their due process rights. In referring to the remarks made to one of the defendants, the court observed that:

> [t]he import of these remarks seems to be that the restraint imposed during trial was intended to be coercive and not penal, and that the court had not yet considered whether an additional penal sentence could and should be imposed. They do not constitute a forthright "positive notification" to the defendant that he was subject to an additional punitive sanction if the court chose to invoke it.

254 F.2d at 692. This followed the court's notation that, at one point in the civil contempt proceedings, the trial court had stated that "[t]he question of punishment for violating any order of the Court has not been considered." *Id.*

#### B.

The *Yates* and *Daschbach* cases prescribe a rule that a witness held in civil contempt for refusing to testify must be unequivocally advised by the court that the civil sanction he will receive does not preclude later criminal sanctions based on the same conduct. While we are sympathetic to the concerns that prompted the announcement of this rule in *Yates*, we do not believe that the Due Process clause requires such a warning. Accordingly we respectfully decline to follow those cases.

As a matter of policy we have little quarrel with the notion that "positive notification" of the possibility of subsequent criminal sanctions will lessen confusion. It would be commendable to include such notice in immunization procedures because it would advance the interests of all parties concerned. A witness' interests would be served by assuring that he was fully aware of all of the consequences of his actions. The interests of the government in coercing the witness to testify and of the court in coercing the witness to obey its order would be advanced because the weight of the coercion would increase as the witness became aware of further undesirable consequences.

That a practice is advisable, though, does not mean it is required by law. It might well lessen confusion to post criminal penalties in prominent places in which particular laws could be violated, and this is occasionally, though rarely, done. An example may be found as near to hand as the "franked" envelopes used by this court and other government agencies, which advise the user of a specific penalty if they are used for private purposes. There is, of course, no general requirement that all penalties be posted in places and manners that would do the most good.

Where courts or court rules have required affirmative warnings to defendants of the consequences of their actions, it has not been simply because some of those consequences are not readily apparent. Most often affirmative warnings are required when rights are about to be waived, such as Fifth Amendment rights to avoid self-incrimination and to have counsel present during custodial interrogation, *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or the right to

---

5. The *Daschbach* court observed that this "positive notification" would have been required "at or about the time coercive restraint was applied." 254 F.2d at 692.

a trial by jury at which one may have assistance of counsel and may cross-examine witnesses, *see* Rule 11(c)(3) and (4), Fed. R.Crim.P. (prescribing specific notification before pleas of guilty or *nolo contendere* may be accepted).[6] Monteleone had no rights to waive; having been immunized, he had no more right to disobey Judge Evans' order than a bank robber has to rob a bank, and therefore no greater right to be told in advance of the possible consequences of his act.

Monteleone asserts that he was more likely to be misled because of the potential for two terms of incarceration imposed by the same authority for the same conduct, admittedly not a common situation outside the area of contempt, and suggests that this confusion was aggravated by Judge Evans' reference to "punish[ing] him accordingly" in his discussion of civil (*i.e.* coercive) contempt. While we agree that such confusion is more likely in this situation, it does not follow that the court (or any other officer) is obligated to take affirmative steps to avoid it. Whether Monteleone was confused about the *consequences* of his actions is not relevant to his guilt, or (more specifically) to the state of mind necessary to convict.

■ The maxim that "ignorance of the law is no excuse" is one that we have termed "time worn." *Wilson v. Health and Hospital Corporation of Marion County*, 620 F.2d 1201, 1211 (7th Cir.1980). It is not an absolute rule; "ignorance" may

be a defense when it negates a mental state that is an element of the charged offense. *United States v. Petito*, 519 F.Supp. 838, 841 (E.D.N.Y.1981), *aff'd* 671 F.2d 68 (2d Cir.1982), *citing* W. LaFave and A. Scott, *Criminal Law* § 47 (1972). In order to convict Monteleone of criminal contempt under 18 U.S.C. §§ 401 and 402, the government had to prove that he "willfully" disobeyed Judge Evans' order. *See United States v. Ray*, 683 F.2d 1116, 1127 (7th Cir.), *cert. denied*, 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1982); *United States v. Patrick*, 542 F.2d 381, 389 (7th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977) (discussing requirement that intent be shown, *i.e.* that the act be "knowingly" and "willfully" done). The showing of knowledge required only refers to Monteleone's awareness of Judge Evans' order and his understanding of its contents. Monteleone was convicted of willfully disobeying that order; all that he had to understand in order to decide whether to violate the law was what the order said. The government did not have to prove that Monteleone knew he was violating a particular provision of law. *United States v. Berardelli*, 565 F.2d 24, 30 (2d Cir.1977). It follows that he did not have to be aware, or to be made aware, of specific consequences of that violation.[7]

### III.

■ Monteleone has raised several additional issues for our consideration.[8] He

---

**6.** Rule 11(c)(1) requires that the court advise a defendant of the penalties he faces. At that point, though, he has already been charged and can no longer "back out" of the criminal act. The notice required by this provision is directed to a defendant's decision on how to plead, not on whether to act in the first place.

**7.** At pages 1007–1008 *supra* we pointed out that *Petito* discussed the requirement of a warning at the time civil sanctions are imposed. Nevertheless we regard our holding herein as compatible with the Second Circuit's conclusion that no positive notification is required, a conclusion based in part on *Berardelli*. *See Petito*, 671 F.2d at 73 n. 6, and accompanying text. Our holding is also in harmony with *United States v. Seale*, 461 F.2d 345 (7th Cir.1972). In that case the defendant was bound and gagged in court in

response to disruptive behavior committed during his criminal trial. Without extensive discussion we held that he "need not specifically have been warned nor indeed be aware that his conduct could be visited with a criminal penalty as opposed to another type of sanction." 461 F.2d at 366, *citing United States ex rel. Shell Oil Co. v. Barco Corp.*, 430 F.2d 998, 1001 (8th Cir.1970).

**8.** Conceding that Supreme Court precedent is against him, *see Yates v. United States*, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957) and *United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1946), Monteleone asserts that his criminal conviction based on the same conduct for which he was incarcerated civilly violates the Fifth Amendment's Double Jeopardy clause. With due appreciation for

first argues that he was deprived of a fair trial by the failure of the district court to delete all references to his invocation of his Fifth Amendment privilege from the transcripts of his court hearings and grand jury appearances that were admitted as exhibits at trial. The record reflects that *most* of those references were either deleted entirely or replaced with the words "refused to testify", but some remained.

Monteleone's blanket assertion that a jury should never be told of a defendant's invocation of the Fifth Amendment and his reliance on *Miranda,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), *Gruenwald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), and their progeny are misplaced. Those cases concerned the use in a criminal trial of the fact that a defendant had invoked his Fifth Amendment rights in declining at some earlier time to give information *relevant to his guilt or innocence of the offense for which he was on trial.* Monteleone "took the Fifth" when asked what had prompted him to refuse to testify in *1979,* but he was tried and convicted of criminal contempt for refusing to testify in *1983.* The few Fifth Amendment invocations admitted at trial thus concerned matters other than his guilt or innocence of the offense for which he was on trial; they could not be interpreted as implicitly incriminating in that proceeding.

■ Absent any direct Fifth Amendment concern the references were admissible unless their probative value was "substantially outweighed" by prejudicial or confusing effect. Rule 403, Fed.R.Evid. The balancing of these factors is committed to the broad and sound discretion of the trial court, and will not be overturned by this court unless that discretion is abused. *United States v. Peters,* 791 F.2d 1270,

1308 (7th Cir.1986). It is apparent on this record that substantial discretion was exercised, as the trial judge went over the exhibits extensively with counsel in an effort to avoid repeated, and possibly confusing, references to the Fifth Amendment. He may also have wished to avoid such fractional prejudice as might result from *any* reference to the Fifth Amendment. A few references remained where editing would have made some passages unclear, but the judge specifically instructed the jury that no adverse inferences should be drawn from them. Under these circumstances we find no abuse of discretion.

■ Monteleone also contends that the trial judge erred in refusing to instruct the jury on a defense of reliance in good faith on the advice of counsel that he had complied with Judge Evans' order by reading the brief statement he had prepared. He asserts that this belief was supported by his knowledge of the scope of the grand jury's investigation, which he thought had been covered by the statement. Although Judge Evans specifically ordered him to "give testimony,"[9] Monteleone argues that "[f]rom [his] point of view, the judge could have been wrong and [his] lawyer could have been correct." *Appellant's Br.* at p. 32.

We dealt with an argument similar to Monteleone's in *United States v. Ray,* 683 F.2d 1116 (7th Cir.), *cert. denied,* 459 U.S. 1091, 103 S.Ct. 578, 74 L.Ed.2d 938 (1982). Ray refused to obey a district court order that he provide specific handwriting exemplars to the F.B.I. and was convicted of criminal contempt. Ray claimed to believe that he had complied with that order by giving samples of his writing to state authorities in an earlier investigation, but the trial court excluded evidence of his belief. In upholding that ruling we observed that Ray's own evaluation of his conduct in

counsel's candid admission that the point was raised simply to preserve it for further review, we adhere to those cases and reject that claim.

**9.** At the October 5 hearing, Judge Evans ordered that Monteleone "appear before the Grand Jury, [and] give testimony under the previously-is-

sued immunity grant ... at the direction of the Prosecutors." The written order entered on that date (Government Exhibit 18) directed him to "answer the questions which he is asked and produce what evidence is required of him ..."

light of the court order could not excuse him from contempt liability because the meaning of the order was clear and its correctness was not an issue for him to pass upon:

> A good faith effort to comply with a court order tends to negate willfullness, an element of criminal contempt which must be proven beyond a reasonable doubt ... Yet the appellant misconstrues the defense of good faith compliance as allowing the defendant in a contempt proceeding to "second guess" the necessity for the order he is charged with violating. In most instances, a defense of good faith compliance arises when a defendant has not refused to comply with the court order he is charged with violating, but has failed to comply because of the indefiniteness of the order or some other inability to do so ... The appellant does not contend that there was any confusion in his mind, nor could there have been, between the state court order compelling handwriting samples to the state authorities and the district court order compelling handwriting samples to the F.B.I ... The court's order was valid, and the wisdom or necessity for the order could not constitute a defense to contempt for a refusal to comply with the order.

683 F.2d at 1126–1127.

It makes no difference that Ray relied on a defense based on his own interpretation of the order, while Monteleone's defense depends on alleged reliance on advice of counsel.[10] Judge Evans' order was unambiguous and uncomplicated; Monteleone could not reasonably have believed that reading his statement complied with that order, no matter what his lawyer told him. While cooperation with counsel should be encouraged, an attorney may not exculpate his client of contempt by advising him to disobey an order of the court because the judge is "wrong".

### IV.

■ Monteleone finally argues that the four-year sentence he received was excessive. While as a general matter this court will not review the size of a sentence absent unusual circumstances, Monteleone correctly points out that we bear a "special responsibility" in reviewing criminal contempt sentences due to the absence of any maximum penalty in either 18 U.S.C. § 401 or Rule 42, Fed.R.Crim.P. *See Green v. United States*, 356 U.S. 165, 188, 78 S.Ct. 632, 645, 2 L.Ed.2d 672 (1958); *Ray*, 683 F.2d at 1122–1123; *Patrick*, 542 F.2d at 392. Nevertheless, this responsibility does not amount to plenary review. Sentencing by district courts under the criminal contempt statutes is still a matter of discretion. *Green*, 356 U.S. at 188–189, 78 S.Ct. at 645–650. Accordingly we must place great reliance on the district court's decision. *Patrick*, 542 F.2d at 392.

■ Addressing the record before the district court at sentencing, Monteleone directs our attention to a number of positive factors, mostly concerning his involvement with his family, business and community. The government's sentencing presentation centered around Monteleone's involvement with and activities in support of organized crime, and included lengthy testimony at an evidentiary hearing by an immunized informant under federal witness protection. Monteleone has not argued that any of this evidence was improperly admitted or considered. In passing sentence the district judge took note of the points in Monteleone's favor, but also commented extensively on the important institutional role of the grand jury in the criminal process and of Monteleone's part in disrupting that process, as well as his association with "people of very unsavory standing in our society." He further expressed a specific desire to deter future disobedience in similar situa-

---

10. It has been suggested that good faith reliance on advice of counsel that one was in compliance with a court order could be a defense to criminal contempt. *See, e.g., United States v. Snyder*, 428 F.2d 520, 522–523 (9th Cir.), *cert. denied,* 400 U.S. 903, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970). We have found no case, nor has counsel cited any, in which denial of such an instruction has been held erroneous.

tions. We do not find that the judge exceeded his discretion in imposing a four-year sentence.

We reject Monteleone's suggestion that his sentence, the same as was imposed in the *Patrick* case, should be reduced because his offense was "less serious" than Patrick's. Comparing sentences imposed for different criminal acts by different judges is a poor method for determining whether discretion has been properly exercised, as it suggests that greater discretion is lodged with the first judge than with the second. It is more apt to note that Monteleone's sentence (like Patrick's, *see* 542 F.2d at 393 n. 14) was within the five year statutory limit for those convicted of obstructing a criminal investigation under 18 U.S.C. § 1510, a crime analytically similar to Monteleone's conduct. Legislative sentence limitations are more properly, though again not conclusively, considered in determining the limits of sentencing discretion in contempt cases because they are intended as principles of general application.

Monteleone misconstrues our *dictum* in *Patrick*, 542 F.2d at 393, that "[we] believe the punishment in a case such as [Patrick's] should be greater than in cases where a witness has merely refused to testify before a grand jury." That statement cannot be read as a general limitation on contempt sentences, which like all sentences are individually considered decisions. Monteleone was sentenced on a record that included more than just his contemptuous conduct. We bear in mind Justice Harlan's admonition in *Green*, 356 U.S. at 188, 78 S.Ct. at 645, that "[t]he answer to those who see in the contempt power a potential instrument of oppression lies in assurance of its careful use and supervision, not in imposition of artificial limitations on the power."

## V.

Finding no error in John Monteleone's conviction or sentence, we AFFIRM the judgment of the district court.